## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ASSOCIATED WHOLESALE          )
GROCERS, INC.,                )
                             )
          Plaintiff,          )
                             )
     v.                       )     Case No. 13-CV-2182 JAR/DJW
                             )
UNITED POTATO GROWERS OF      )     **JURY TRIAL DEMANDED**
AMERICA, INC., UNITED POTATO  )
GROWERS OF IDAHO, INC., UNITED II )
POTATO GROWERS OF IDAHO, INC., )
WADA FARMS, INC., CEDAR FARMS, )
INC., WADA FAMILY LLC, WADA   )
FARMS POTATOES, INC., WADA    )
FARMS MARKETING GROUP, LLC, PRO )
FRESH LLC, ALBERT WADA, BLAINE )
LARSEN FARMS, INC., POTANDON  )
PRODUCE, LLC, MICHAEL CRANNEY, )
CORNELISON FARMS, INC., SNAKE )
RIVER PLAINS POTATOES, INC.,  )
DRISCOLL POTATOES, INC., LANCE )
FUNK, RIGBY PRODUCE, INC.,    )
PLEASANT VALLEY POTATO, INC., )
KCW FARMS, INC., KIM WAHLEN   )
FARMS, RAYBOULD BROTHERS      )
FARMS, LLC., R.D. OFFUT CO.,  )
RONALD D. OFFUTT, JR.,  AND   )
IDAHOAN FOODS, LLC,           )
                             )
          Defendants.

## ORIGINAL COMPLAINT

Plaintiff states and alleges the following against Defendants, upon knowledge with respect to its own acts and upon information and belief and investigation by counsel with respect to all other matters. The investigation includes but is not limited to a review of: (a) public statements by Defendants and their affiliates, agents and employees, including statements in court proceedings and civil, government and regulatory investigations

246189

involving Defendants; (b) regulatory filings by Defendants; (c) documents believed to be authentic copies of Defendants' business records obtained from public record sources; and (d) government and industry publications.

## **INTRODUCTION**

1.      This antitrust action arises out of a long-running conspiracy between and among potato growers, owners, packers, cooperatives, and marketing and shipping agencies to fix the price of fresh and process potatoes.

2.      The Defendants named herein are part of two trade groups – the United Potato Growers of Idaho ("UPGI") and the United Potato Growers of America ("UPGA").  Together, these Defendants have members in 12 states and represent over 80% of all the potato acres in the United States.

3.      Defendants, who include the largest potato growers and shippers in the United States, conspired to use pre-harvest and post-harvest methods to control and reduce the supply of potatoes in order to raise and stabilize the prices at which potatoes were sold in the United States.

4.      In order to facilitate the conspiracy, the Defendants first came together in 2004 to form regional and nationwide "cooperatives" — not for the purpose of marketing and selling their potato products collectively, as is the function of a traditional cooperative — but rather for the purpose of creating a national vehicle for potato growers and their co-conspirators to reduce potato output and fix prices.

5.      Defendants analogized their potato cartel to the Organization of Petroleum Exporting Countries ("OPEC") — the notorious petroleum supply-reduction and price-fixing cartel composed of various foreign nations. Defendants suggested that they should "study" the OPEC model and their organization was referred to as the "OPEC of Potatoes."

6.     As shown below in detail, Defendants conspired to and did reduce and constrain the supply of potatoes and artificially inflated the price of potatoes by their agreement to reduce planting acreages, destroy current stock, and limit the number of potatoes available for sale. These coordinated efforts by Defendants were designed to and did dramatically increase the prices of potatoes.

7.     The conspiracy, which began on or about September 2004 at the latest and continues through the present (the "Relevant Period"), directly impacted Plaintiff.

8.     Plaintiff has been forced to pay supra-competitive prices for potatoes and, thus, as a result of Defendants' illegal actions, has been injured.

## JURISDICTION AND VENUE

9.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), for permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and for full consideration, treble damages, and permanent injunctive relief pursuant to the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.

10.     This Court has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.  This Court further has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. § 1332, as this action is between citizens of different States and has an amount in controversy in excess of $75,000.

11.     Venue is proper in this Court pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) (c) & (d), because:

(a)     a substantial part of the events giving rise to these claims occurred in this District, including the sales to Plaintiff of fresh and process potatoes at

artificially high prices;

(b)     each Defendant is subject to personal jurisdiction in this District; and

(c)     Defendants transact business in this District.

12.     Defendants are subject to the personal jurisdiction of this Court because:

(a)     they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in this District, and Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling potatoes throughout the United States, including in this District;

(c)     they are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling potatoes to Plaintiff and others in this District at artificially inflated prices;

(d)     they are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and/or the Kansas Long Arm Statute, K.S.A. 60-308 because each Defendant, either personally or through their co-conspirators in furtherance of the conspiracy, has sufficient minimum contacts with Kansas, including that each Defendant: transacted (and

continues to transact) business in this state, committed tortious acts within Kansas; entered into contracts with a Kansas resident that were to be performed in whole or in part in Kansas; and caused injury in Kansas arising out of acts or omissions outside of Kansas while Defendants were engaged in solicitation or service activities within Kansas.  In addition, Defendants have submitted to the jurisdiction of the Court because of their continuous and systematic contacts with Kansas; and

(e)     they contracted to supply services or goods, including potatoes, or have agents who contracted to supply materials or goods, including potatoes, in this District; money flowed from Plaintiff in Kansas to pay Defendants for potatoes; Defendants transact business in the District or have agents who transact business on their behalf in the District in furtherance of the conspiracy; Defendants committed unlawful acts or caused one or more unlawful acts to be done, or consequences to occur, in the District; and Defendants engaged in unlawful conduct described below outside of the District causing injury to Plaintiff in the District.

## **PLAINTIFF**

13.     Plaintiff Associated Wholesale Grocers, Inc. ("AWG") is a Kansas corporation with its headquarters and principal place of business in Wyandotte County, Kansas, at 5000 Kansas Avenue, Kansas City, Kansas 66106.  Founded in 1924, AWG provides over 2,000 grocery stores and other retail outlets with a complete assortment of grocery, fresh meat, fresh produce, specialty foods and general merchandise items.   From its Kansas corporate headquarters, AWG purchased potatoes sold by one or more of the Defendants, their

subsidiaries, divisions, units or affiliates.  As a result, AWG has been injured by reason of the antitrust violations alleged herein.

14.     AWG is a purchaser of fresh and processed potatoes.

## DEFENDANTS

15.     The acts alleged herein that were done by each of the co-conspirators, were fully authorized by each of those co-conspirators, or ordered or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

### POTATO COOPERATIVES

### United Potato Growers of America, Inc.

16.     Defendant United Potato Growers of America, Inc. ("UPGA") is a non-profit corporation organized, existing, and doing business under the laws of Utah with its offices and principal place of business located in Salt Lake City, Utah. UPGA participated in and facilitated the supply-restriction and price-fixing scheme alleged herein.

17.     UPGA's stated mission is to "manage national potato supply so as to positively affect grower profitability."

18.     UPGA was formed in March of 2005 to assist regional potato cooperatives and their individual grower members in their collective efforts to restrict supply and fix prices by designing, proposing, and implementing various price-fixing initiatives, including pre-planting acreage reductions, market data reporting and analysis, and product-flow controls designed to prevent price reductions.

19.     UPGA has also provided professional leadership, data-gathering and analysis capabilities to growers, and it has served as a forum for regional cooperatives to share information about their supply-restriction efforts.

20.     UPGA's members consist of individual companies and regional cooperatives that controlled or were major decisional forces in the UPGA. These members acted in concert with and through UPGA to implement and enforce the conspiracy alleged herein.

21.     UPGA's members are located throughout the United States.

22.     UPGA has a sister organization in Canada.

23.     Through its alliance with the Canadian organization and the Potato Marketing Association of North American ("PMANA"), UPGA's members represent 80 percent of the potato acres grown in the United States and Canada.

**United Potato Growers of Idaho, Inc.**

24.     Defendant United Potato Growers of Idaho, Inc. (formerly known as "United Fresh Potato Growers of Idaho") ("UPGI") is a corporation organized, existing, and doing business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho. UPGI participated in the supply-restriction and price-fixing scheme as alleged herein.

25.     UPGI is a founding cooperative member of UPGA.

26.     UPGI has been described as the "OPEC of potatoes."

27.     In 2004, twenty-three Idaho potato growers — who collectively accounted for 85% of the fresh potatoes produced in Idaho and 25% of the fresh potatoes produced in the United States — met and agreed to collectively reduce potato supplies and fix prices through UPGI. Within one year, UPGI had received commitments to reduce potato supply from farmers responsible for approximately 91% of the fresh potato acreage in Idaho, including commitments from all of the founding members of UPGI.

28.     UPGI's charter reflected its goal of working with similar cooperatives in other potato-growing states to manage supply. That effort was extraordinarily successful. By 2005,

UPGI's founders had colluded with all of the potato trade groups in Idaho and met with growers in numerous states to help form regional cooperatives all over the country.

29.     Defendant Albert Wada, an Idaho grower who helped create UPGI —gathered these other regional representatives in 2005 and with them formed Defendant UPGA, the nationwide cooperative.

### United II Potato Growers of Idaho, Inc.

30.     Defendant United II Potato Growers of Idaho, Inc. ("United II") is a corporation organized, existing, and doing business under the laws of Idaho with its principal place of business located in Idaho Falls, Idaho. United II participated in the supply-restriction and price-fixing scheme as alleged herein.

31.     UPGI formed United II on or around March 2007 after UPGI acquired the assets of Idaho Fresh-Pak Corporation, a potato processor that operated plants in Eastern and Southern Idaho.

32.     The first United II board of directors included the following persons, each of whom is affiliated with one or more of the Defendants named herein: Albert Wada, Dave Beesley, Jeff Raybould, Carl Taylor, and Gary Hansen. All United II members were required to be members of UPGI.

33.     The stated purpose of United II, as articulated in its Articles of Incorporation, was to "stabilize potato prices and supplies in the State of Idaho." UPGI sought to use United II as a means to further the overall conspiracy of reducing potato supply.

34.     United II created a joint venture with Defendant R.D. Offutt Co. (the largest potato grower in the country) to form a new entity, defendant Idahoan Foods, LLC. Idahoan Foods, LLC is one of the largest potato dehydrators in the country.

POTATO GROWERS, PACKERS, MARKETING AGENCIES, AND LICENSORS

Wada Farms Defendants

**Wada Farms, Inc; Cedar Farms, Inc.; Wada Family, LLC; Wada Farms Potatoes, Inc.; Wada Farms Marketing Group, LLC; Pro Fresh, LLC; and Albert Wada**

35.     Defendant Wada Farms, Inc. is a corporation organized, existing, and doing business under the laws of Idaho with its principal place of business located at 1487 Parkway Drive in Blackfoot, Idaho. Wada Farms, Inc. participated in the supply-restriction and price-fixing scheme alleged herein.

36.     Defendant Cedar Farms, Inc. is a corporation organized, existing, and doing business under the laws of Idaho with its principal place of business located at 1487 Parkway Drive in Blackfoot, Idaho. Cedar Farms, Inc. participated in the supply-restriction and price-fixing scheme alleged herein.

37.     Defendant Wada Family, LLC is a limited liability company organized, existing, and doing business under the laws of Idaho with its principal place of business located at 326 S. 1400 W. in Pingree, Idaho. Wada Family, LLC participated in the supply-restriction and price-fixing scheme alleged herein.

38.     Wada Farms, Inc., Cedar Farms, Inc. and Wada Family, LLC are the Wada business entities that grow potatoes. As such, Wada Farms, Inc., Cedar Farms, Inc. and Wada Family, LLC are referred to collectively herein as the "Wada Grower Entities."

39.     Defendant Wada Farms Potatoes, Inc. is a corporation organized, existing, and doing business under the laws of the state of Idaho with its principal place of business located at 1487 Parkway Drive in Blackfoot, Idaho. Wada Farms Potatoes, Inc. participated in the supply-restriction and price-fixing scheme alleged herein.

40.     Defendant Wada Farms Potatoes, Inc. (and previously Wada-Van Orden Potatoes, Inc.) is the Wada corporate entity responsible for washing, grading, packing and shipping potatoes grown by the Wada Grower Entities and others. Defendant Wada Farms Potatoes, Inc. is thus referred to herein as the "Wada Packing Entity."

41.     Wada Farms Potatoes, Inc. operates a 140,000 square foot facility in Pingree, ID.

42.     Defendant Wada Farms Marketing Group, LLC ("Wada Farms Marketing") is a limited liability company organized, existing, and doing business under the laws of Idaho with its principal place of business located at 326 S. 1400 W. in Pingree, Idaho. Wada Farms Marketing participated in the supply-restriction and price-fixing scheme alleged herein.

43.     Defendant Pro Fresh, LLC is a limited liability company organized, existing, and doing business under the laws of Idaho with its offices and principal place of business located at 326 S. 1400 W in Pingree, Idaho. Pro Fresh, LLC participated in the supply-restriction and price-fixing scheme alleged herein.

44.     Defendants Wada Farms Marketing and Pro Fresh, LLC are the Wada corporate entities responsible for the marketing and sale of potatoes grown by the Wada Grower Entities as well as potatoes grown by other growers and washed and process by the Wada Packing Entity. Wada Farms Marketing and Pro Fresh, LLC are referred to collectively herein as the "Wada Marketing Entities." The Wada Marketing Entities have offices in Idaho, Oregon and Texas; they market and distribute potatoes throughout the United States.

45.     Defendant Albert Wada ("Wada") is the Chairman and former CEO of each of the Wada defendants listed above. Wada is domiciled and resides at 1385 W. Highway 39 in Pingree, Idaho.

46.     Wada controlled each of the Wada defendant entities identified above from the inception of such entity until at least 2010. According to a Financial Analysis prepared by Northwest Farm Credit Services in 2008, Wada owns 90% of Wada Family LLC, 77% of Wada Farms Potatoes, Inc., and 62% of Wada Farms Marketing Group, LLC. The independent report notes that Wada "owns the vast majority of and has complete control over these entities, and they are operated in concert with one another. . . ."

47.     Wada and the Wada companies identified herein have operated as and continue to operate as a single, vertically integrated business, referred to as "Wada Farms."

48.     Wada has operated this single "Wada Farms" business in disregard of the separate corporate form of each of the Wada defendant entities throughout the period of time relevant to the allegations made herein.

49.     In an August 2011 brief in another lawsuit against Wada and related entities, Wada Farms represented that it is a "large, vertically integrated organization that utilized smaller entities within [its] corporate structure to handle every aspect of growing potatoes—some entities grew the potatoes for them and others, like. . . Wada Potatoes, washed, graded, and packaged them . . . Wada Farms sought to vertically integrate so that [it] could handle all aspects of potato growing, marketing, and selling so that [it] did not have to rely on third parties during any part of the process. The packing sheds served as one arm of the corporation that allowed [it] to achieve this goal." The packing shed referred to is Defendant Wada Farms Potatoes, Inc.

50.     The Wada entities share a common website, www.wadafarms.com. The website explains, under a page entitled, "Our Farm":

> Based in Southeastern Idaho, this family-owned and operated business is dedicated toward the delivery of fresh and innovative products sustainably. Growing over a billion potatoes annually, we are among the largest growers and shippers in the industry.

Wada Farms operates in 6 diversified farming locations across three counties, totaling around 30,000 irrigated acres. The original farming operation has expanded to include a fresh potato, onion and sweet potato sales & marketing group, 140,000 sq. ft. fresh potato packing warehouse and trucking company.

51.     Profits from the marketing and packing entities are used to support the farm operations.

52.     The business and financial operations of the Wada defendant entities are intertwined. As Dallas Ward, CFO for the Wada Group of Companies, explained in sworn testimony: "The farm provides the potatoes so that these companies — [Wada Farris Potatoes, Inc.] can make money, so the marketing company can make its money. And those funds find their way back to the farm to service debt."

53.     A 2008 Northwest Farm Credit Services analysis of the Wada businesses similarly explained that "all income or loss" attributable to Wada Farms Potatoes, Inc. and Wada Farms Marketing Group, LLC "is passed through to the farm entities."

54.     Wada Family, LLC, in seeking a 2008 intermediate term loan, submitted to the lender a consolidated balance sheet that includes the following Wada defendant entities: Albert Wada, Wada Family, LLC, Wada Farms, Inc., Wada Farms Potatoes, Inc. and Wada Farms Marketing Group, LLC (included as a single column). The bank considering the loan evaluated the "Wada et al." group of companies collectively as a single entity, and issued a risk rating for the "Wada et al." group reflected on the consolidated balance sheet.

55.     A Northwest Farm Credit Services 2007 memorandum concerning an operating credit line renewal application for defendants Wada Farms, Inc. and Cedar Farms, Inc. ("2007 NWFCS Memo") similarly evaluated the Wada businesses as a single entity, explaining that: **"The Company's** vertical integration allows Wada to capture additional margin by marketing its own potatoes." (Emphasis added).

56.     The 2007 NWFCS Memo states that collateral for the loan sought by Wada Farms, Inc. and Cedar Farms, Inc. included assets of various Wada defendant entities, including: "a first lien on crops, accounts receivable and inventory, as well as a first or best blanket lien on machinery and equipment.   Additionally, an assignment will be made to the bank of any proceeds that may result from the outcome of the litigation against Oust [to which Wada Farms, Inc.; Cedar Farms, Inc.; Wada Farms Potatoes, Inc.; and Wada Family, LLC were party]. . . . The best lien position has been obtained for all long-term assets of Wada Family, LLC. . ."

57.     The 2007 NWFCS Memo further states that, to remain in compliance, "Wada Farms" is required to submit "[m]onthly financial statements on Wada Farms Potatoes, Wada Van Orden Potatoes, Wada Farms Marketing Group and Profresh."

58.     Wada Farms Marketing Group, LLC identifies itself in legal documents as Wada Farms Marketing Group d/b/a Wada Farms Potatoes, Inc.

59.     Wada Farms Marketing Group, LLC and Wada Farms Potatoes, Inc. are treated as a single entity for accounting and balance sheet purposes.

60.     Wada Farms, Inc. and Cedar Farms, Inc. are treated as a single entity for accounting and balance sheet purposes.

61.     The Wada defendant companies share a CFO, Dallas Ward; a tax accountant, Layne Van Orden; and an IT expert, Jay Stowell. Bryan Wada explained in sworn testimony in February 2011 that Jay Stowell "is currently an employee of the Wada Marketing Group, and we use him as needed with the other entities."

62.     Wada himself has stated that Wada's enterprises are working cooperatively to become more vertically integrated. In an interview, Wada said, "Wada is becoming more

vertically integrated through its involvement with growing, packing and shipping, marketing and sales, transportation and now dehydration processing."

63.     The participation in the supply-reduction and price-fixing conspiracy by each of the Wada defendant companies was on behalf of, and implicated, each of the other Wada defendant companies as a result of Albert Wada's and the companies' disregard for their corporate structures.

64.     The Wada Grower Entities were direct participants in the UPGI/UPGA acreage reductions schemes as alleged herein. The Wada Packing Entity participated in the flow control scheme alleged herein. The Wada Marketing Entities were direct participants by acting as the marketing arm of the Grower and Packing entities and selling the price-fixed potatoes on their behalf with direct knowledge of and acquiescence to these schemes. These corporate structures have little meaning beyond the overall integrated Wada Farm company and they all participated in and profited from the schemes as alleged herein with ultimate profits flowing to the Wada Grower Entities and Wada himself.

65.     Wada personally helped develop, implement, and maintain the price-fixing scheme alleged herein.

## Larsen Farms/Potandon Defendants

### Blaine Larsen Farms, Inc.

66.     Defendant Blaine Larsen Farms, Inc. ("Larsen Farms") is a corporation organized, existing, and doing business under the laws of the state of Idaho with its principal place of business located in Hamer, Idaho. Larsen Farms participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

67.     Larsen Farms grows, packs, and distributes potatoes under the Larsen Farms brand and private labels. Larsen Farms operates farmland and facilities in Idaho, Nebraska, and

Colorado and services retail and food-service customers worldwide. The company also makes processed potato products (crushed, diced, flaked, and sliced), which it supplies to food processors.

68.     Larsen Farms grows, stores, processes, and transports its own potatoes and refers to itself as a "vertically integrated potato grower."

69.     Blaine Larsen of Larsen Farms was one of the founders of UPGI, a UPGI Board Member, and an originator of the price-fixing scheme alleged herein.

### Potandon Produce LLC

70.     Defendant Potandon Produce LLC ("Potandon") is a limited liability company organized, existing, and doing business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho. Potandon participated in the supply-restriction and price-fixing scheme as alleged herein by participating in flow control – the controlled limitation of potato supply to the market – among other things.

71.     Once a division of Pillsbury, Potandon is now an independent company owned by five prior Pillsbury managers and six grower/shippers who control the company's operations. With over 45,000 acres and six packing facilities in Idaho, Potandon sells potatoes and onions to major retailers, club stores, wholesalers, produce distributors, and restaurant chains across the United States at the direction, on behalf of and/or as the agent of its grower/shippers.

72.     In June 2002, Potandon merged the sales and marketing activities of an entity known as Idaho Fresh Cooperative ("IFC") into its operations. IFC is a 70 grower cooperative with over 25,000 acres of potatoes and six packing sheds located throughout the Snake River Valley.

73.     In June 2002, Potandon also merged the sales and marketing activities for High Country Potato, located in Rexburg, Idaho.

74.     Two Washington grower/shippers (Harvest Fresh Produce in Othello and Balcom & Moe of Pasco) merged with Potandon in June of 2005. In January of 2006, Potandon merged with Murakami Produce, the largest supplier of onions in the Idaho/Oregon region.

75.     In October 2006, Potandon merged the sales activities for Defendant Larsen Farms into Potandon.

76.     There is significant overlap between Potandon, UPGI and UPGA. More specifically, the member owners of Potandon include: Cornelison and Ron Olsen, both of whom attended the initial UPGI meeting and signed on to the supply-reduction and price-fixing scheme alleged herein; Harvest Fresh Produce, whose president Allen Floyd was on the original UPGA Board of Directors; Defendant Larsen Farms, whose president Blaine Larsen attended the initial UPGI meeting and signed on to the supply-reduction and price-fixing scheme alleged herein; and Howard Taylor & Sons, Inc., whose president Carl Taylor attended the initial UPGI meeting and signed on to the supply-reduction and price-fixing scheme alleged herein.

77.     Outside of Idaho, Potandon has established an extensive network of over 60 potato and onion co-packers in 24 states with another nine co-packers in Canada. In addition, Potandon is involved in multiple joint venture growing areas and has several exclusive sales agreements.

78.     By combining these sales and marketing functions of its growers, Potandon has positioned itself as the largest marketer of potatoes in North America. Potandon controls a 25% share of the Idaho potato market and a 12% share of the total national potato market.

79.     Potandon owns the exclusive licensing rights to the Green Giant® brand for fresh potatoes and onions (pursuant to an agreement with non-defendant co-conspirator General Mills, Inc.). Potandon also markets SunSpiced potatoes.

80.     Potandon sells potatoes throughout the United States. It solicits internet sales of potatoes on its website at www.potandon.com/contact.

81.     Potandon is owned and/or controlled by its suppliers and has conspired with its potato growers to assist in efforts to reduce potato supplies and fix prices and has directly profited from the price-fixing scheme detailed herein.

82.     Potandon also participated directly in flow control efforts (coordinated by growers, as well as UPGI and UPGA) that were a key component of the supply-reduction and price-fixing scheme alleged herein.

### OTHER GROWER DEFENDANTS

Michael Cranney (Cranney Farms)

83.     Defendant Michael Cranney ("Cranney") is an individual doing business as Cranney Farms, an assumed business name under the laws of the State of Idaho and located in Oakley, Idaho. Michael Cranney is domiciled and resides at 503 W. 1300 S in Oakley, Idaho. Michael Cranney participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

84.     Cranney Farms grows process and fresh potatoes, sugar beets, corn, wheat and barley.

85.     Cranney is a founding member of UPGI and one of the original incorporators of UPGA. At a January 2008 UPGA meeting, Cranney, in his role as Chairman of the UPGA Supply Management Committee, reminded grower attendees of UPGA's instruction to reduce potato acreage in the coming year by 5%—and told the audience that UPGA would advise non-members to do the same.

Cornelison Farms, Inc.

86.     Defendant Cornelison Farms, Inc. ("Cornelison Farms") is a corporation organized, existing, and doing business under the laws of Idaho, with its principal place of business located in Rexburg, Idaho. Cornelison Farms participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

87.     Cornelison Farms grows, packages, and ships fresh potatoes.

88.     With Wada, Cornelison of Cornelison Farms organized the first meeting of growers in September 2004 of what would eventually become the UPGI. Cornelison Farms is a founding member of UPGI and has long advocated collective action to reduce potato supplies.

### Snake River Plains Potatoes, Inc.

89.     Defendant Snake River Plains Potatoes, Inc. ("Snake River Plains Potatoes") is a corporation organized, existing, and doing business under the laws of Idaho, with its principal place of business located in Rexburg, Idaho. Snake River Plains Potatoes participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

90.     Snake River Plains Potatoes is an integrated potato producer that grows, packs, stores, and ships its own potatoes.

91.     Snake River Plains Potatoes is a founding member of UPGI and a UPGA member. David Beesley, chief executive officer of Snake River Plains Potatoes, is a member of the UPGA executive committee.

### Driscoll Potatoes, Inc.

92.     Defendant Driscoll Potatoes, Inc. ("Driscoll Potatoes") is a corporation organized, existing, and doing business under the laws of Idaho, with its principal place of business located

in American Falls, Idaho. Driscoll Potatoes participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

93.    Driscoll Potatoes is an integrated potato producer that grows, packs, stores, and ships its own potatoes.

94.    Driscoll Potatoes is a founding member of UPGI.

95.    Loraine Driscoll ("Driscoll") of Driscoll Potatoes is an original incorporator of UPGA. Driscoll has served on the UPGA Board of Directors.

### Lance Funk (Lance Funk Farms)

96.    Defendant Lance Funk is an individual doing business as Lance Funk Farms, an assumed business name under the laws of Idaho, located in American Falls, Idaho. Lance Funk is domiciled and resides at 3853 Rast Road in American Falls, Idaho. Lance Funk participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

97.    Lance Funk Farms is a potato grower.

98.    Lance Funk Farms is a founding member of UPGI.

### Rigby Produce, Inc.

99.    Defendant Rigby Produce, Inc. ("Rigby Produce") is a corporation organized, existing, and doing business under the laws of Idaho and is located in Rigby, Idaho. Rigby Produce participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

100.    Rigby Produce is an integrated potato producer that grows, packs, stores, and ships its own potatoes.

101.    Rigby Produce is a founding member of UPGI.

**Pleasant Valley Potato, Inc., KCW Farms, Inc., and Kim Wahlen d/b/a Kim Wahlen Farms**

102.     Kim Wahlen ("Wahlen"), who operates 6,000 acres of farmland, including over 1,700 acres of potatoes, participated in the supply-restriction and price-fixing scheme alleged herein on behalf of three entities: Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley Potato"); Defendant KCW Farms, Inc. ("KCW Farms"); and Defendant Wahlen d/b/a Kim Wahlen Farms.

103.     Pleasant Valley Potato is a corporation organized, existing, and doing business under the laws of Idaho and is located in Aberdeen, Idaho. Pleasant Valley Potato participated in the supply-restriction and price-fixing scheme alleged herein by agreeing to flow control measures, among other things.

104.     Pleasant Valley Potato is an integrated potato producer that grows, packs, stores, and ships its own potatoes. Pleasant Valley Potato was formed in 1988 for the purpose of "processing, packing and marketing of potatoes."

105.     Wahlen is one of the original incorporators of Pleasant Valley Potato and has been a director of Pleasant Valley Potato since its formation in 1988. As of October 2004, Wahlen served as director and registered agent for Pleasant Valley Potato.

106.     Pleasant Valley Potato markets the potatoes grown by KCW Farms, Inc. and Kim Wahlen Farms.

107.     KCW Farms, Inc., formerly known as Kim Wahlen Transport, Inc. ("KCW Farms"), is a corporation organized, existing, and doing business under the laws of Idaho and is located in Aberdeen, Idaho. KCW Farms is a potato grower and participated in the supply-restriction and price-fixing scheme as alleged herein.

108.    Wahlen is one of the original incorporators of KCW Farms and has been a director of KCW Farms since its formation in 1998. As of October 2004, Wahlen served as president and registered agent for KCW Farms.

109.    Wahlen used the assumed business name Kim Wahlen Farms and conducted business under that name as a potato grower in Aberdeen, Idaho. Kim Wahlen Farms is identified on the Pleasant Valley Potato website as one of Pleasant Valley's growers. Pleasant Valley markets the potatoes grown by Wahlen, d/b/a Kim Wahlen Farms. Wahlen, d/b/a Kim Wahlen Farms, participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

110.    Wahlen, acting on behalf of and as agent for Pleasant Valley Potato, KCW Farms, and Kim Wahlen Farms, is a founding member of UPGI. Wahlen participated in the October 2004 meeting (alleged in more detail below) during which UPGI was formed. Wahlen's name appears in the November 2004 Articles of Incorporation of UPGI as one of "the incorporators of the Cooperative," and he is one of the signatories of that document.

111.    Wahlen's conduct in joining the conspiracy was admittedly intended to benefit each of the potato operations in which he was involved, namely: Pleasant Valley Potato, KCW Farms, and Kim Wahlen Farms. All three operations are potato growers who would directly benefit from the acreage reduction scheme and the resulting inflated prices alleged herein.

112.    Pleasant Valley's packing, shipping, and marketing functions were also implicated. Wahlen acknowledged in an April 7, 2007 article in *Spudman*, a potato business magazine, that he joined UPGI and the conspiracy alleged herein because of "the instability of the potato market" and because he was "very troubled, in the past, about how we market our crop. Everyone was doing major expansion and the market was too mature to handle it." As a

potato packer, shipper, and marketer, Wahlen's company Pleasant Valley Potato was critical to the conspiracy's success.

113.    When Wahlen became an incorporator of UPGI, and joined the original October 2004 meeting during which the conspiracy was first formed, he acted on behalf of each potato growing, packing, shipping and marketing entity with which he was affiliated, including Pleasant Valley, KCW Farms, and Kim Wahlen Farms.

## Raybould Brothers Farms LLC

114.    Defendant Raybould Brothers Farms LLC ("Raybould Brothers Farms") is a limited liability company under the laws of Idaho and is located in Rexburg, Idaho. Raybould Brothers Farms participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

115.    Raybould Brothers Farms grows and sells fresh potatoes.

116.    Raybould Brothers Farms is a founding member of UPGI, and Jeff Raybould of Raybould Brothers Farms is an original incorporator of UPGA.

## Offut Defendants (R. Offutt Co. & Ronald D. Offutt, Jr.)

117.    Defendant R.D. Offutt Co. ("R.D. Offutt") is a subsidiary of RDO Holdings Co., a corporation organized, existing, and doing business under the laws of North Dakota with its principal place of business located in Fargo, North Dakota. R.D. Offutt participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage and participate in a scheme to divert fresh potatoes to the dehydration market, among other things.

118.    Defendant Ronald D. Offutt, Jr. ("Ron Offutt") is the Chairman and Founder of R.D. Offutt. Ron Offutt controls R.D. Offutt.

119.     R.D. Offutt has approximately 190,000 acres of farming operations across eight states and is one of the nation's largest producers of potatoes with approximately 60,000 acres devoted to potatoes. According to R.D. Offutt's listing in the 2010 National Potato Council Statistical Yearbook, R.D. Offutt's "[p]roduction is utilized in all segments of the potato market —fry, chip, fresh and flake."

120.     In July 2010, R.D. Offutt acquired the assets of Ryan Potato Company, a major fresh potato packing facility that is "a nationally recognized name in the fresh table potato industry."

121.     Ron Offutt and R.D. Offutt are affiliated with the Potato Marketing Association of North America ("PMANA"), an organization that generates potato marketing data. PMANA provides potato marketing data to Defendant UPGA which is used to facilitate the potato supply reduction and price fixing scheme alleged herein. Defendant UPGA refers to PMANA as its "sister cooperative."

122.     R.D. Offutt, one of the world's largest potato growers, sent representatives to at least one of the initial UPGI meetings. R.D. Offutt had representatives at a November 2004 meeting where UPGI founders recruited members for its organization and outlined UPGI's commitment to raising fresh potato prices by reducing fresh potato supply. Ron Offutt and R.D. Offutt were therefore aware of UPGI's anticompetitive objectives and eventually agreed to join these efforts.

123.     R.D. Offutt explicitly agreed to join UPGI in or about March 2007— thereby affirming his commitment to UPGI's potato supply manipulation agenda — and agreed to reduce supply as a result. Offutt's agreement to join UPGI (and thus the UPGI/UPGA acreage reduction scheme) was celebrated and lauded to the UPGI membership in UPGI's March 2007 newsletter.

124.    R.D. Offutt agreed to join UPGI at the same time that it, under Ron Offutt's control, entered into a joint venture with United II to participate in another aspect of the supply control scheme as alleged herein.

125.    In or about March 2007, R.D. Offutt partnered with Defendant United II to create a joint venture. The joint venture is entitled Idahoan Foods, LLC, and was originally known as North American Foods LLC. The contribution of R.D. Offutt to the joint venture consisted of potato processing plants in several states. The R.D. Offutt — United II joint venture enabled potato growers to offload surplus potatoes into the dehydration market and further reduce supplies, thus facilitating and contributing to the price-fixing scheme alleged herein.

126.    Pursuant to the joint venture, R.D. Offutt's Nevada and Idaho dehydration plants were to be supplied exclusively by United II members.

127.    Ron Offutt and R.D. Offutt were aware that UPGI and United II desired to create the dehydration joint venture in order to further manipulate the fresh potato supply. R.D. Offutt, under Ron Offutt's control, consciously facilitated that potato market manipulation by entering into the joint venture with United II.

128.    R.D. Offutt benefited from the conspiracy alleged herein in its capacity as a grower and packer of fresh potatoes, and in its capacity as a grower and dehydrator of process potatoes.

129.    R.D. Offutt owns approximately 54% of Idahoan Foods through two of its subsidiary companies, *i.e.,* U.S. Foods, Inc. ("U.S. Foods") and RDO Frozen Co. of Delaware, Inc. ("RDO Frozen"). US Foods Inc. owns 38% of Idahoan Foods, and RDO Frozen owns 16% of Idahoan Foods.

130.    R.D. Offutt, along with United II, dominated and controlled Idahoan Foods, LLC.

<u>**NON-GROWER DEFENDANTS**</u>

**Idahoan Foods, LLC (f/k/a North American Foods, LLC)**

131.   Defendant Idahoan Foods, LLC (formerly known as North American Foods, LLC, referred to herein as "Idahoan Foods") is a limited liability company organized, existing, and doing business under the laws of Delaware with its principal place of business located in Grand Forks, North Dakota. North American Foods participated in the supply-restriction and price-fixing scheme alleged herein.

132.   Idahoan Foods is a joint venture between Defendants R.D. Offutt, a potato grower and processor, and United II, a co-operative of potato growers. Idahoan Foods manufactures mashed-potato products and dehydrated potato products.

133.   United II owns approximately 46% of Idahoan Foods. R.D. Offutt, through two subsidiary entities, owns approximately 54% of Idahoan Foods.

134.   Idahoan Foods was dominated and controlled by two entities, United II and R.D. Offutt, in disregard of Idahoan Foods' separate corporate identity.

135.   United II and R.D. Offutt dominated Idahoan through control of the Idahoan Foods board of directors. The Idahoan Foods board of directors is comprised of United II members and R.D. Offutt executives, including the following: Albert Wada; Ron Offutt; Keith McGovern (CEO of R.D. Offutt); and Tyler Falk (another R.D. Offutt executive).

136.   United II and R.D. Offutt have controlled Idahoan Foods by placing their members and employees in key positions with Idahoan Foods. For example:

      a.   Kerry Buck, Idahoan CFO, was previously an employee of Defendant Blaine Larsen.

      b.   Sam Huffman, Idahoan VP of operations, is a former owner of Winnemucca Farms, a Nevada dehydration plant acquired by R.D. Offutt in 1999. Huffman continued to work for Offutt following the acquisition.

      c.      Drew Facer, Idahoan VP of Marketing, was a marketing employee of Idaho Fresh-Pak, which UPGI acquired prior to the joint venture.

137.    R.D. Offutt is the registered agent for Idahoan Foods in Minnesota and North Dakota.

138.    Wada is one of the grower/owners involved in this joint venture that supplies potatoes to Idahoan.

139.    Through its United II/R.D. Offutt joint venture, UPGI has devised an admitted means of furthering its supply-reduction and price-fixing efforts through Idahoan.

140.    All Defendants are collectively referred to herein as "Defendants." Whenever in this Complaint reference is made to any act, deed, or transaction of the Defendants, the allegation means that the Defendants engaged in the act, deed or transaction by or through their officers, directors agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of Defendants' business or affairs.

## RELEVANT PRODUCT AND RELEVANT MARKET

141.    Potatoes are one of the most popular products sold in the United States. The global market for potatoes is in the billions of dollars.

142.    The market for the production of potatoes in the United States is concentrated, and during the Relevant Period that market was dominated by Defendants.

143.    The market for the manufacture of potatoes is mature and, but for the conspiracy alleged herein, producers compete primarily on price.

144.    Because of their high collective market share in the United States, Defendants are together able to exercise their market power, including the ability to fix, maintain, and raise

prices in the United States market for potatoes (hereinafter the "Relevant Market").  Defendants collectively have approximately 80% of the Relevant Market.

145.    The Relevant Market has significant barriers to entry.

146.    Further, any new entrant to the market must be able to spend significant sums on advertising and product proliferation.

147.    Access to supply channels is also critical to gain a foothold in the Relevant Market, as wholesale distributors and chain grocery stores form the most significant distribution channels for sales of Defendants' potatoes.  This sort of widespread distribution of potatoes is necessary, yet extremely costly for a company looking to enter the market.

148.    While barriers to entry in the Relevant Market are very high, there are essentially no barriers to expansion in this market.

## TRADE AND COMMERCE

149.    During the Relevant Period, Defendants engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce is substantial.  In particular:

> (a)    Defendants sold and shipped substantial quantities of potatoes in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which the Defendants produced potatoes;
>
> (b)    data, information, correspondence and/or financial material were exchanged between each Defendant in the state in which each is located, incorporated, or has its principal place of business and other states; and
>
> (c)    money flowed between banks outside of the state in which each Defendant is located, incorporated, or has its principal place of business and other

states.

150.    The effect of Defendants' and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## FACTUAL ALLEGATIONS

### I.    The Potatoes Market

151.    Potatoes are the most important vegetable in the diet of United States consumers. During the last twenty years, potatoes were ranked as the second most important product in United States food consumption following wheat flour.

152.    Potato consumption can be divided into four general categories:

a.    Table stock (also known as fresh potatoes) includes numerous varieties such as round white, round red, russet and Irish potatoes;

b.    Potatoes for processing includes chips and shoestring, dehydrated, frozen (french fries and other forms such as patties), canned, starches and flours;

c.    Other sales including seed and feed for livestock; and

d.    Non-sale uses such as shrink, loss and on-farm uses such as feed and seed.

153.    The United States potato industry is a multi-billion dollar annual market. For example, in 2007, the United States potato market had a total production of 449 million cwt (hundredweight or 100 pounds) of potatoes and the value of such production was $3.2 billion dollars.

154.    In 2008, total domestic potato production was 415 million cwt, approximately 7 percent below the 2007 crop levels (due to the supply reduction price-fixing scheme alleged herein). Despite the reduced production, however, overall market value of production was $3.49 billion—an increase of 13 percent over 2007 production values.

155.     Potatoes are grown primarily in the Western and Northern regions of the United States. Potato crops are generally planted in the spring and harvested in the fall (these are known as "fall potatoes"), although potatoes are also harvested in the other seasons depending on where they are grown.

156.     Because of good storage technology and practices, the marketing season for fall potatoes extends from July (early harvest areas) through June of the following year.

157.     Idaho and Washington are the two largest potato-producing states (growing mostly "fall potatoes"), with market shares of 28.2% and 22.7%, respectively. North Dakota, Colorado, Wisconsin, Oregon, Maine and Minnesota account for another 30 percent of U.S. production, with 23 other states accounting for the remaining 19 percent.

158.     California, Florida and Texas lead production of winter, spring, and summer potatoes. These potatoes have a smaller share in the total potato market, but satisfy specific needs for the fresh and process markets.

159.     Fresh potatoes are usually sold in the open market and processing potatoes are typically sold through contracts. Processing potato contracts are usually signed prior to the planting season and specify a potato variety, quantity, and base price with incentives based on quality requirements.

160.     The fresh and process potato markets are interconnected. According to Defendants, one of the problems contributing to excess potato supply was process growers planting acres of potatoes not under contract to sell on the open market. Thus, it was important to fresh potato growers to get process potato growers to agree to the price fixing conspiracy, as well. Defendants' price fixing scheme, as alleged herein, was designed to and did fix, raise, maintain, and/or stabilize prices for both fresh potatoes and potatoes sold for processing.

161.    Potatoes can be readily stored and transported, making it possible to market them to both the fresh and processed market. The fresh market generally commands the highest price. Nearly two-thirds of potatoes were used for processing in 2008, with frozen french fries and other frozen potato forms being the largest segment. Table stock accounted for 28% of use and the remainder went to feed, seed and other uses.

162.    Many fresh potato growers (such as several of the Defendants herein) are vertically integrated and handle growing, packing, shipping, and even further processing on their farms. Many of the large potato growers also act as packing and shipping operations for other growers.

163.    Packing sheds generally work in conjunction with (or are owned by) growers to wash, grade, and pack potatoes to be shipped to direct purchasers such as retailers and distributors.

164.    Between 1971 and 1996, per capita consumption of potatoes rose from 117.8 lbs to 145.0 lbs, with much of the growth attributable to sales of french fries. But by 2006, consumption had declined to 130.2 lbs, with frozen potatoes making up the majority of consumption.

165.    While potatoes were the single most-consumed vegetable in the United States in 2007, consumption in total pounds and as a percentage of total vegetables consumed have been declining since 2001. Average yearly potato consumption per person was 138.8 pounds in 2001, had declined to 126.0 pounds in 2007 and was forecasted to further decline to 125.3 pounds in 2008. Potatoes were 31.4 % of all vegetables consumed in 2001 and were only 28.4 % in 2007. The decline was true for both fresh potatoes and potatoes for processing, although the decline

was greater for fresh potatoes. Fresh potato consumption declined almost 16% from 2001 to 2007, while potatoes for processing declined nearly 6% over the same time period.

166.    Before 1990, fresh potato consumption exceeded frozen potato consumption; after 1990, there has been a steady increase in consumption of frozen potatoes and a steady decrease in consumption of fresh potatoes.

167.    Despite declining demand, potato demand is highly price inelastic. A 1% decrease in fresh potato supply can cause up to a 7% increase in price due to a lack of suitable alternatives.

## II.    The Formation and Operation of Defendants' Potato Cartel

168.    In response to declining prices, Idaho potato growers grew concerned about their profits in the early 2000s.

169.    Between 1990-2004, Idaho had one of the lowest average potato prices with one of the highest price variability. The average potato price during that period was $4.77 per cwt.

170.    In 2000, Idaho potato growers suffered an average loss of $2.67 per cwt.

171.    In 2004, the average production cost was higher than the average fresh potato price received by potato producers. While the potato production cost was in the range of $4.63 to $5.23 per cwt, the average fresh potato price was only $3.89 per cwt.

172.    In addition, the market was characterized by an excess of supply.  In 2004, UPGA estimated that Idaho produced "over 7 million more cwt. than the market needed, at any price."

173.    In 2003, several Idaho growers agreed to implement acreage reductions in order to reduce supplies. Given the limited success of these schemes, however, one of the largest potato growers in the country, Defendant Wada, decided to form an Idaho "cooperative" with

other Idaho growers in order to formalize a joint agreement among his competitors to reduce potato supply and fix, raise, maintain and/or stabilize prices.

174.     Wada began realizing his expressed intent of "managing North American potato supply" by first seeking to organize Idaho potato growers. In late 2004, along with other Idaho potato growers, Wada co-founded United Fresh Potato Growers of Idaho ("UFPGI"), which was later renamed UPGI. Wada hoped UPGI would serve as a nucleus for an even larger, nationwide "cooperative" with member co-ops in each potato-producing state.

175.     The declining number of potato farmers made organizing easier – the number of potato farms decreased from 1,425 to 818 between 1997 and 2002, while average acres increased from 229 to 445 acres.

176.     In all, 86% of all potato acres and all potato production are concentrated in farms with more than 1,000 acres, representing 52% of all potato farms. Consequently, the remaining 48% of all potato farms produce only 14% of all potatoes in Idaho.

177.     Collusion was also easier given that demand for potatoes is inelastic, so restricting supply raises grower prices and revenues.

178.     Wada called his potato price-fixing plan, "United We Stand" and openly discussed how he wanted to "unite" potato growers, "decrease competition," and "rationalize the industry" by collectively curtailing production. UPGA's website makes a similar point: "[i]n 2004, after evaluating the economic realities of the current business climate, a group of potato growers decided that long-term production and supply management are critically needed to provide stability and a reasonable return for growers."

179.     The potato cartel was first formalized when Wada organized a meeting of Idaho potato farmers in September of 2004 to discuss how to "curb production" and "boost prices" for

potatoes. At this meeting, Wada and Cornelison (of Defendant Cornelison Farms) summoned 23 Idaho potato growers to an office in Blackfoot, Idaho to discuss how their collective efforts at reducing potato supplies would help fix, raise, maintain, and stabilize prices.

180.    After further discussion among these growers, the group agreed to form UPGI with the explicit goal of reducing potato supplies through various means.

181.    The 23 growers in attendance at this meeting became the founders of UPGI, which filed for incorporation on November 2, 2004.

182.    The individuals at the initial UPGI meeting who explicitly signed on to the supply reduction and price-fixing scheme alleged herein included: Blaine Larsen (of Defendant Larsen Farms), Albert Wada (of the Wada Defendants Entities), and Defendant Michael Cranney (of Cranney Farms) the three largest potato growers in Idaho and among the biggest growers in the U.S.

183.    Other Idaho-based growers at this meeting who became founders of UPGI and signed on to the price-fixing and capacity reduction scheme, some of whom are named as Defendants herein, include Keith Cornelison (of Defendant Cornelison Fanns), David Beesley (of Defendant Snake River Plains Potatoes), George Crapo (of Crapo Farms, Inc.), Mark Cummins (of Cummins Farms/Cummins Family Produce), Loraine Driscoll (of Defendant Driscoll Potatoes), Jeff Duffin (of Duffin Potato Company), Paul Duncan and Defendant Lance Funk (of Lance Funk Farms), Gary Hansen (of Hansen Farms), Dale Mickelson (of Defendant Rigby Produce), Ron Olsen (of Murdock Farms), Jeff Raybould (of Defendant Raybould Brothers Faims), Carl Taylor (of Howard Taylor & Sons), Kim Wahlen (of Defendant Pleasant Valley Potato, Defendant KCW Farms, and Kim Wahlen, d/b/a Kim Wahlen Farms), Blair

Walker, Dick Watt (of Sunspiced Grower Cooperative), Lynn Wilcox (of Floyd Wilcox & Sons), Clint Young, and Roy Young.

184.    In the Articles of Incorporation of UPGI, the stated purpose of the organization is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

185.    In October of 2004, the UPGI founders issued a press release discussing their goals of "supply management" principles and asked other potato growers from around the country to attend another meeting to discuss the formation of additional regional and national groups to assist in their price-fixing efforts. The next cartel price-fixing meeting occurred on November 3, 2004, at 10:00 a.m. at the Shiloh Inn Convention Center in Idaho Falls, Idaho—the day after UPGI's articles of incorporation were filed.

186.    Growers from Colorado, Oregon, Washington, Wisconsin, and California joined the Idaho potato farmers at the meeting. The meeting was closed to the media. At the meeting, Wada announced the group's price-fixing plans to several hundred potato farmers, which prompted a standing ovation. Many farmers signed on to the supply reduction agreement on the spot agreeing to pay annual dues ranging from about $10,000 to $500,000 depending on how much acreage each farmer utilized for growing potatoes. Defendant R.D. Offutt, one of the world's largest potato growers, sent a representative to this meeting. R.D. Offutt subsequently agreed to the price-fixing scheme alleged herein and participated in a joint venture to further aid the potato supply-reduction efforts.

187.    On December 2, 2004, the 23 founding members of UPGI, all of whom had signed on to the supply management scheme, voted to move the commitment date to join the co-op to January 17, 2005 — two weeks ahead of the original membership deadline. At this point,

the group already had 80 percent of all acres dedicated to fresh potatoes in Idaho committed to supply reductions under its membership agreements. By February of 2005, UPGI was colluding with owners of 91 percent of the fresh potato grower acreage in Idaho through various means.

188.     The fresh potato market is strongly affected by, and interrelated with, the processing potato and seed potato markets. Cooperation with the process and seed potato growers was crucial for UPGI's success. Thus, UPGI sought out groups of process and seed growers to sign on to its anticompetitive scheme.

189.     As of December of 2004, UPGI had negotiated "Memorandums of Understanding" ("MOU") with the directors of several potato grower groups in Idaho, including Potato Growers of Idaho ("PGI"), Potato Management Company ("PMC"), Seed Potato Growers of Idaho ("SPGI"), and the Southern Idaho Potato Cooperative ("SIPCO"). SPGI and SIPCO later joined UPGI as independent districts. These MOUs meant UPGI was now working in cooperation with growers representing 60% of all Idaho potato acres.

190.     PGI was formed in 1968 to serve as a bargaining unit for growers in contract negotiations with potato processing companies. PGI's represents growers with governmental, legislative and industry organizations. PGI serves as the principle sources for growers as they seek information on market conditions, industry developments, crop information and farming practices.

191.     PMC was founded in 2000 by a group of Idaho potato growers and shippers to help reduce potato supplies. The group was successful in organizing various programs, including charitable donations and cattle feeding, that removed several million hundredweight of potatoes from the market. In addition, the group donated over 15 million pounds of potatoes to help reduce domestic supply.

192.    SIPCO was founded in 1997 and acts as the bargaining unit for Idaho frozen process growers. SIPCO's members grow potatoes across Idaho. SIPCO sets quality standards and negotiates annual contracts with Idaho and Oregon processors with the goal of providing a stable and reasonable rate of return for the Idaho frozen process grower.

193.    UPGI and SIPCO together represented 80% of all potatoes produced in Idaho at that time. The SIPCO members represented 80% of all processed potato production and the UPGI members represented 85% of all fresh and seed potato production.

194.    UPGI and SIPCO share a common marketing agency. UPGI "manages" the SIPCO members' fresh potato acres and SIPCO "manages" the United members' processing potato acres.

195.    SPGI is a group of seed potato growers. Seed potatoes are produced to be used for planting new crops of potatoes. Once cut into sets and planted, seed potatoes grow into tablestock potato varieties. Seed potatoes themselves are not intended for human consumption.

196.    These groups are not cooperatives within the meaning of the Capper-Volstead Act, yet UPGI collaborated and conspired with them to reduce potato supplies. Through the cooperation insured by these MOUs, the growers, shippers, and other entities working collectively with UPGI to reduce potato supplies accounted for more than 60 percent of *all* Idaho potato acres (and not just the vast majority of those devoted solely to fresh potato production).

197.    At the December meeting, UPGI adopted a three-phased approach to fixing prices. First, UPGI sought to control the acres being planted to adjust for any oversupply. Second, UPGI would monitor the crop for yield and collect information on stocks-on-hand to better manage the supply. Finally, UPGI would institute a farmer buy-out program to remove excess supplies before the crop reached the market.

198.   UPGI (and later UPGA) eventually implemented four types of volume control mechanisms to increase the price of potatoes:

(a)   Acreage limitations imposed on members to limit production volume;

(b)   Market flow control to coordinate shipments during season transitions to ensure that oversupplies do not decrease prices;

(c)   Market allocation programs, including conspiring with growers, processors and industry organizations involved in all major potato market sectors, to coordinate the balance of supplies into the various potato markets; and

(d)   Rigorous potato grading standards for fresh potatoes to limit the supply.

199.   To achieve its supply reduction objectives, UPGI developed and started enforcing a set of programs and policies that targeted both production and marketing of fresh potatoes. The level of potato production was controlled through the implementation of two policies. First, before the beginning of a planting season, the potato supply and production was controlled by enforcing an acreage management program, strictly limiting the amount of acres that could be planted, which was further implemented through a bid buy-down program. Secondly, during the potato growing season, before harvest, the production was monitored over time and accurate yield predictions were made; this was implemented through a series of field digs.

200.   UPGI's marketing programs also included coordination of potato shipments throughout a marketing year, providing marketing information to potato growers and implementation of secondary market strategies. UPGI also sought to remove excess potatoes by identifying new market opportunities such as donating potatoes to charities.

201.   Upon information and belief, UPGI also employed another supply management tool — "shipping holidays." The UPGI marketing committee would review market information,

including data from each member's packing operation. Each week they would decide if a "shipping holiday" would be imposed. If a "shipping holiday" was put in place, each potato packing operation affiliated with UPGI through various growers would shut down for at least one eight-hour shift in order to further reduce supplies and increase prices.  Further, no potato shipping occured during a few weeks around August – September.

202.   UPGI realized that its most effective method of controlling supply would be to manage the production of the next year's potato crop through acreage reductions.

203.   UPGI's first year acreage management program was implemented in spring 2005. The number of planted fresh potato acres for the fall 2005 crop was reduced by approximately 15% (26,000 acres) relative to the 2004 year acreage base against which the reduction was measured.

204.   In 2005, there were approximately 70,000 fewer acres of fresh potatoes planted nationwide. UPGI claimed responsibility for 55% of the reduction and 75% of the reduction in the states where UPGI was organized.

205.   In 2005, UPGI called for reductions in crop volume of 8-10%.

206.   In 2005-06, UPGI helped erase 6.8 million cwt. of potatoes from the U.S. and Canadian markets. This helped drive up the market price over 48%.

207.   UPGI also implemented a bid buy-down program. Potato growers submitted bids on how much they needed to be compensated in order not to plant potatoes on a certain amount of their acreage, and UPGI accepted the best (i.e., lowest) bids, thus resulting in further acreage reductions.

208.   UPGI also executed a secondary market strategy at the beginning of 2005 that removed approximately 8% of potato stock from the market: surplus remaining from the 2004

fall crop was diverted to charities and food banks. For example, in January 2005, UPGI donated 40,000 pounds of potatoes to food banks for the expressly-stated purpose of reducing potato supplies.

209.    Marketing conference calls were also implemented. The calls took place twice a week at the state level (and were later established as once a week at the national level with the formation of UPGA). The calls were a "market conversation" to discuss supply levels. Prior to a conference call, participating warehouses would log on to the UPGI web-page and provide information on capacity, stocks and pack-outs. This data, along with other information (prices, trends, weather, etc.), were discussed during the conference call, and were summarized as a marketing summary posted on the Internet to assist with "flow control" – the limitation of supply sent to the market – which prevented potatoes from being shipped when prices were too low.

210.    With the understanding that these supply management techniques would need to be undertaken on more than just a regional level, UPGI used UPGA and the other co-conspirators, including Potandon, to institute its supply-restriction techniques on a much broader, nationwide scale. Wada and his co-conspirators nationalized (and internationalized) their potato supply-restriction efforts and assisted in forming other regional and national potato cooperatives with this goal in mind.

211.    According to one industry observer, market data reporting and product flow controls are key components of UPGA's efforts to control potato supplies and "enhance" producer returns. Just as acreage-reduction efforts depend on the participation and cooperation of growers, market data reporting and flow control efforts depend on the participation and cooperation of those involved in the marketing, sale and shipment of potatoes (such as Potandon).

212.    UPGI uses a precise tally of how many bags of potatoes shoppers carry home from the grocery-store checkout stand to establish a week-to-week demand curve for potatoes.

213.    In its monthly newsletter, UPGI emphasized the importance of flow control as a means of managing supply, noting that "[for flow control to work, growers and [packing] sheds need to communicate and work together. Supply management falls apart if the sheds and growers undermine each others [sic] efforts to raise prices by flooding the market."

214.    In January 2006, UPGI implemented a program to coordinate and discipline the flow and supply of fresh potatoes, reduce price volatility, and raise prices. The program sought to balance the supply available to consumers and dehydrators to avoid periods of oversupply. Shippers were provided target prices and quantities on UPGI's websites. Weekly conference calls at state and national levels helped disseminate market intelligence and establish price and quantity targets.

215.    Potandon and its growers hold weekly meetings that include Potandon's top executives and Potandon's potato growers (who also participate in these discussions with other growers through UPGI/UPGA).

216.    To level out the supply of potato crops and the price, UPGI established shipping quotas, asked members to store potatoes instead of shipping, and coordinated its activities with cooperatives in other areas of the country. For instance, in August 2005, UPGI announced a temporary shipping quota from September 12, 2005 through September 23, 2005. The quota was established in order to boost prices by limiting supply in the fall while preserving enough potatoes for spring.

217.    Recognizing the need for national coordination, in December 2004, UPGI met with growers in Colorado and Wisconsin to aid in the formation of United Fresh Potato Grower

groups in those states as well. Oregon growers in Klamath basin formed another group in that state. In February 2005, Washington growers also met to coordinate supply restrictions. Regional potato grower cooperatives were later formed in Central California, and other areas of the Southwest, Midwest, and West.

218.    As UPGA's website states, "Idaho leaders reach[ed] out to growers in other regions and invite[d] them to form their own supply-management cooperatives as part of the united effort. Soon, regional coops [were] formed in Colorado, Klamath basin (on the border of California and Oregon), Washington-Oregon, and Wisconsin. (Later, growers in central California, the Southwest, Midwest and West form[ed] co-ops.)" In addition, a cooperative-at-large is established to allow isolated growers to join UPGA.

219.    With these regional cooperatives established, UPGI formed UPGA on March 9, 2005. UPGA was a national group, under the leadership of Wada, that could coordinate the supply restrictions discussed herein across the country and North America.

220.    The original incorporators of UPGA include: Albert Wada (of Defendant Wada Farms); Loraine Driscoll (of Defendant Driscoll Potatoes); and Jeff Raybould (of Defendant Raybould Brothers Farms).

221.    The initial Board of Directors were Tony Amstad (of Amstad Produce Inc. in Oregon); Warren Boegel (of Boegel Farms in Kansas); Defendant Michael Cranney (of Cranney Farms in Idaho); Dennis Day (of Montana); Allen Floyd (of Harvest Fresh Produce in Washington); Tom Franconi (of Kern Produce Shippers in California); Dick Okray (of Okray Farms in Wisconsin); Ed Staunton (of Staunton Farms in California); Dave Warsh (of Warsh Farm in Colorado).

222.    According to the UPGA website, "[r]ealizing the need for national coordination, communication, data gathering and analysis, professional leadership and staff to handle the many facets and programs of the organization, United Potato Growers of America [was] formed" in March 2005. The national cooperative facilitated the nationwide supply-restriction campaign through its regional cooperative members (which were in turn made up of individual growers who implemented the actual supply reductions).

223.    An August 2007 article in *High Country News* entitled "The Sultans of Spuds - Battered by their own success, farmers form the 'OPEC of Potatoes'" described the meetings of UPGA and this "potato cartel" as follows:

> Once a month, usually on a Wednesday morning, about a dozen men arrive at the Salt Lake City airport on separate flights from around the country. They are whisked into waiting cars for the five-minute trip to a glass fronted office building nearby. There, in an unpretentious conference room, they meet several more of their associates.
>
> These men are the leaders of a little-known international cartel, and at meetings such as these, they fine-tune an elaborate system of production targets and quota transfers to control the price of the commodity around which their world revolves. It is a serious business, backed up with reconnaissance from satellites orbiting high above the Earth, and the organization's strict code of conduct allows for the use of what its members artfully refer to as "punitive measures" against anyone who violates the rules. And, at lunchtime, the men always pause to sample their merchandise. "We always serve potatoes. We always serve potatoes, whether it's chips or fried or mashed or whipped or salad," says Barb Shelley, one of a small cadre of people who carry out the organization's legwork. Not even lunch, it turns out, is safe from the group's intense scrutiny: "When we order from the caterer, we say, 'These are potato growers. We want your highest quality potatoes. Do not" - Shelley pauses ominously - "'give us bad quality."
>
> This may sound like a plot lifted straight out of a Mel Brooks movie, but the potato cartel is real. And its existence speaks volumes about the often-perverse dynamics of American agriculture.

224.     Mr. Shahan was also quoted in this article as stating that the UPGA's members "are very strong guys that have been kicking people's butts since junior high" and that "to get them in a room and have them discuss market share and things like that, it gets a little Western."

225.     In April 2005, Wada traveled to Prince Edward Island in Canada to facilitate the formation and operation of a North American-wide potato cartel that would reduce potato supplies and fix potato prices across the continent. The entire UPGA Board of Directors met with Canadian growers in Charlottetown, Prince Edward Island, in June 2005 and on August 25, 2005. More than 250 growers attended this meeting, representing more than 96% of the potato acres grown in Canada. The group preliminarily approved starting a Canadian counterpart to the UPGA, and voted to cap potato acreage for each grower. As a result of this meeting and as discussed further *infra,* Canadian growers formed the UPGC, which became a part of the UPGA.

226.     UPGA nationalized the regional supply-restriction scheme initially developed by UPGI. The UPGA's mission statement read: "[w]e bring order and stability to the North American potato growing industry and increase our member potato growers' economic potential by the effective use of cooperative principles."

227.     UPGA's supply control efforts are further confirmed by the mission statements on its own website: "Vision: We will manage national potato supply so as to positively affect grower profitability."

228.     The UPGA's key initiatives are listed as:

> United Potato Growers of America implements strategic supply management programs. Key priorities include providing planting guidelines based on sound data and historical facts; acreage verification programs; information sharing; developing strategic alliances; managing supplies; and improving grower return on investment.

229.    In a Frequently Asked Questions ("FAQ") section that used to appear on its website (but which UPGA has now removed), UPGA detailed its goals regarding supply reduction, its mechanisms for implementing supply reduction, the effectiveness of its supply reduction scheme, and other details of its operations as follows:

> By joining United Potato Growers of America, you can help bring stability to the industry. A stable industry is good for your operation and for the entire industry.
>
> UPGA provides the infrastructure so that growers across the country can share information, evaluate and analyze the market, and better communicate and cooperate for the good of all. By working together, we can manage supply to meet demand, and influence the market to foster a reasonable return for the grower.
>
> UPGA has many programs that help growers work collaboratively to match supply to demand.
>
> UPGA has many initiatives and programs in place to manage supply. Acre buy-down is one of our programs. In most cases, acreage buy down is funded by payments from growers who do not achieve their acreage reduction targets. Each member co-op decides its level of involvement.
>
> Our efforts are targeted at supply management in order to help growers receive a reasonable price for their crop.

230.    In April of 2005, UPGA announced to its members the first nationwide acreage buy-down program in the history of United States potato production. As with UPGI's acreage reduction efforts, grower members were allowed to "bid" acres into the buy-down program if they agreed to plant less acreage than they did in 2004. UPGA member funds would then be used to compensate those growers who agreed to plant less. Similar programs and acreage reductions have continued to present.

231.    Regarding this acreage buy-down program, Wada is quoted as saying: "[t]his is a great opportunity to bring stability and rationale to our Potato Industry... Through cooperation and unity we can and will help ourselves and each other achieve our goals. We strongly

encourage all growers to take advantage of this offer while it is available and join their state or regional cooperative and the United of America Board to reduce 2005 acres."

232.    In a 2006 PowerPoint presentation prepared by Wada for UPGA members titled "The North American Potato Cooperative Movement," Wada detailed strong encouragement for members to stay committed to the supply-restriction efforts. Slides included the following:

> • UNITED = GROWER PROFITABILITY - The UNITED cooperative is gaining the grower critical mass to be able to EFFECTIVELY manage supply in order to attain fair pricing UNITED's System Will Work! - UNITED's programs have helped to increase open market fresh table grower returns for the `05 crop by multiple times 04 crop pricing - Process grower markets are stronger - Econ. 101: The only effective method for influencing price is to manage the supply!
>
> #
>
> The law of ECONOMICS will always win and growers will lose if production and supplies are not managed
>
> #
>
> UNITED'S   STRATEGY?   THE   WHOLE   PILE   OF POTATOES HAS TO BE MANAGED!
>
> #
>
> Cooperative growers must create orderly markets and grow the category instead of fighting for a piece of it by zero-sum competition!

233.    In published articles, Wada confirmed that the purpose of UPGA was to reduce supply and raise prices:

> [Wada] said the major benefit of the association is communication. Sharing supply management data across a broad growing region has allowed the organization to raise prices by better matching potato supplies with demand.
>
> "We're talking to one another," Wada said. He described the industry's oversupply and poor profitability as "an albatross hanging around our necks for years."

"Without supply management and grower solidarity, we don't have adequate profit margins," Wada added. "Growers tend to think it is a sin to produce a profit. Potato growers are very independent and the one thing that they can do is independently go broke."

234.    In another interview, Wada asserted that UPGA had "worked with members to eliminate the potato glut by things like reducing the amount of potatoes planted and pledging not to send potatoes to market in the event of oversupply."

235.    In 2005, UPGA developed "United of America Acreage Management Targets" for the 2006 crop. The guidelines were developed by the United of America Future Crop Committee, in collaboration with UPGA's Future Crop Committees in each UPGA state.

236.    In an attempt to "balance supply with demand," UPGA asked each member to reduce the number of acres planted to 8-10% below the acreage planted in 2004. In a letter to UPGI members in August 2005, Jerry Wright, CEO of UPGI, said, "To achieve this necessary national supply reduction, we need an 8% to 10% co-op average acreage reduction off of the 2004 ACREAGE BASE."

237.    Wright also emphasized that reducing acreage planted was the best way to stabilize and raise potato prices:

238.    "YOU HAVE PROVEN THAT WE CAN CONTROL WHAT WE PLANT. WE CAN AND MUST BALANCE THE MARKET IN 2006 OR RISK WATCHING BAD HISTORY REPEAT ITSELF! In the past, the way you prospered was to plant with no real analysis of national supply and demand fundamentals and then hope for the best. But this year, YOU HELPED CREATE A GOOD MARKET BY PLANTING ONLY ACRES THAT WILL SUPPORT A GOOD MARKET! The strategy of "over-planting" so you can get "lucky" and prosper in '06 will create the same disaster we have had in recent years.......overproduction of +10-12 MILLION cwt, This will again result in rock bottom, cut-throat pricing and $1.00-$3.00

returns to growers. WE CANNOT LET THIS HAPPEN! Instead, we must REMEMBER THE PAST, LEARN FROM IT AND MAKE OUR OWN LUCK and CONTROL WHAT WE PLANT!"

239.    In January 2006, each member was asked to sign a contract committing to acreage reductions.

240.    In 2006, any member who complied with the requested reduction would not be assessed any fees by UPGA. Any member who chose not to reduce acreage below 2004 levels would owe UPGA $50 per acre. This assessment was raised from $27 per acre in 2005. These assessments were paid to UPGA, which were then used to buy out acres within the state or across the country.

241.    Wright emphasized that acreage reductions would increase potato prices: "Without the Acreage Buy-Out program, you could very likely be looking at GRI's of $2-$3 per cwt. when everyone forgets the lessons of the last few bad years caused by overproduction. With your $50 per acre investment of Payment-in-Kind in the acreage reduction plan, we anticipate GRI's greater than $6.50 for the 2006 crop. Per acre, that is more than a 1500% ROI."

242.    UPGA and UPGI's 2007-08 United Acreage Reduction Program established the following rules similar to those of the earlier years: Each base potato acre was assessed at $50. The acreage reductions were calculated according to the "base year" of what was planted in 2004. Members *and nonmembers* willing to participate in the program had two options. The first option was to reduce their potato planting area by exactly 15%, relative to the 2004 year base. This option was considered to be a payment in kind and the grower would owe no cash. The second option was to reduce potato acreage by less than 15% relative to the 2004 year base. In this case, the grower was assessed a pro-rated charge per acre on all base acres.

243.    There were four levels of the pro-rated percentage. For example, if a grower's acreage reduction was between 10% and 14.99%, then the grower paid $20 per base acre; if the acreage reduction was between 5% and 9.99%, then the grower paid $30 per base acre. The collected money was used to "buy out" acres elsewhere. Growers who decided to expand beyond their base were assessed $100 per acre on all acres (expansion plus base acres). This fee was a punitive measure intended to prevent the "mindless expansion" that UPGI and UPGA considered to be illegitimate and against the mission of supply reduction.

244.    Those SIPCO members of UPGI who grew only processing potatoes were allowed to plant only contracted processing potato acres. The UPGI/SIPCO members who grew both fresh and processing potatoes were required to follow the potato planting guidelines for their fresh potato acres and were allowed to plant only contracted processing potato acres.

245.    All UPGA and UPGI members (and some conspiring non-members) agreed to these programs and reduced supply as a result, or paid assessments to allow others to reduce supply.

246.    In 2008, growers following UPGA's plans planted on 80,000 fewer acres than in 2007. In Idaho alone, growers reduced acreage from 350,000 to 300,000. In an interview about why farmers were cutting acres, UPGI's CEO Jerry Wright stated: "[y]ou have the combination of growers having alternative cash crops and they know they have to reduce potato planting to get supply in balance with demand. This is the year they've been able to do it."

247.    In a letter to UPGI's members in 2008, Wright urged members to plant 25% fewer potato acres in 2009 than they had planted in 2004. Wright emphasized that the acreage reduction program could accommodate members who could not reduce their planting, saying,

"There is plenty of fresh base available in the market to work your special circumstances. Call me at [phone number]."

248.    In that same letter, Wright touted the success of the acreage management program:  "We have experienced an unprecedented 3 years of increased returns for spuds since the inception of United Potato Growers of Idaho. That success has been driven by many factors but the single most influential factor by far has been your reduction of acres planted, both in Idaho and by cooperating United growers in Washington, Oregon, California, Colorado, Wisconsin, North Dakota, Minnesota, Montana, Kansas and Nebraska….This is what we all wanted and why you can expect a great market. We all anticipate an exceptional year. BUT, we need to remember what got us here! ACREAGE MANAGEMENT! Every year can be this good if we will just manage the supply."

249.    Wright made clear that the price increases realized by UPGI's members was a result of the acreage management: "WE GOT HERE BY CONTROLLING THE SUPPLY."

250.    In 2008, the acreage of fall-planted potatoes in Idaho decreased by 10.4% from the previous year.  Acres planted in 2007 were 130,010, compared with 116,475 acres in 2008.

251.    In a letter to UPGI's members in 2009, Wright again implored members to further reduce planting: "Please STOP and take a good look at what you are going to do. With the high probability of 5,000 open process acres (that will produce 2MM cwt of open potatoes) PLUS the 4.5M extra cwt in next year's Fresh pile, your GRI's will be almost certainly be BELOW cost of production. I implore every one of you; PLEASE re-evaluate your planting options and change your plans. IT IS NOT TOO LATE. EVERYONE, every process grower, dehy contract grower, fresh grower and seed grower alike, needs to take a deep breath and use some common sense. We need to reduce next year's fresh pile by a minimum of 4.5M cwt…not INCREASE it…..it

doesn't matter what you think YOUR compelling reason or right is, EVERYONE NEEDS TO CUT AN ADDITIONAL 8%. Otherwise, you will most certainly get the market you have "sowed" and it will be a wreck. With that many extra potatoes against next year, the $7.00 return we have today WILL BE A DREAM! Don't you remember 2004? Its coming again."

252.    With regard to the reductions, the UPGA said, "Act responsibly. Don't be part of the problem….PLEASE BE PART OF THE SOLUTION! Remember: LESS ACRES means MORE $$$$$$."

253.    In 2010, the planted acres for potatoes were 112,970, 14.7% less than in 2009.

254.    UPGA's and UPGI's potato acreage reductions and subsequent price increases carried on to the present.

### III.    Defendants Closely Monitored and Enforced the Conspiracy

255.    In order to ensure strict compliance with the supply reduction and price-fixing agreement, UPGI and UPGA conducted audits and utilized GPS, aerial photography, and satellite imaging to verify that co-conspirators had complied with the quotas and not exceeded the potato acreage upon which they agreed to grow.

256.    At the beginning of the planting season, growers filled out a Planting Intention Form. On this form, the grower recorded their 2004 year base acreage and their current year planting intentions by potato variety. The Planting Intention Form was then the grower's commitment against which the grower's actual performance was evaluated.

257.    UPGA also checked farmers' acreage against the paperwork they submitted to the federal Farm Service Agency for government-support programs. The documents used to assess the actual acreage grown were the copies of the Farm Service Agency ("FSA") Form 578 (*i.e.* a

report of acreage). Growers had to agree to allow UPGA access to these otherwise confidential submissions.

258.     Growers had to agree to allow UPGI's and UPGA's field representatives to conduct on-site inspections to verify the growers' compliance with plantings and reductions. The results of the audit were then reported to the Future Crop Committee and the UPGI and UPGA Boards.

259.     Growers had to sign a confidentiality agreement, including non-disclosure of acreage bids and/or bid acceptance by UPGI or UPGA. Violation of the non-disclosure resulted in fines.

260.     Upon information and belief, in 2006, the fields of 25% of the general membership and of 100% of the UPGI Board members were audited, which represented 65% of the UPGI's fresh potato acres. At that audit, all the audited fields were in compliance with supply reduction scheme and bid buy-down programs. The audit confirmed that the audited members of the UPGI reduced the potato acreage by more than 10% relative to the 2004 year base.

261.     Any growers that did "cheat" were subject to punitive measures and fines. For example, the cooperatives' bylaws allowed them to levy fines of $100 per acre against growers who violated the supply reductions. In 2006, growers in Wisconsin paid $50 an acre to grow more than the target recommended by UPGI.  UPGI used that money to "buy down" additional acreage in Idaho, effectively transferring part of Idaho's market share and supply to Wisconsin.

262.     UPGA argued in its newsletter that its acreage buy-out and reduction program would lead to significant financial returns for growers: "[w]ithout the Acreage Buy-Out program, growers very likely will be looking at GRI's next year that will be $3 to $4 per cwt. lower versus 2005. Please do not forget the lessons of the last few bad years caused by overproduction. With

your $50 per acre 'Payment-in-Kind' investment in the acreage reduction plan, we anticipate 2006 GRI's greater than 2005. Per acre, that is more than a 3000% ROI. It is not a gamble; IT IS SMART BUSINESS AND RISK-MANAGEMENT!!"

### IV. Defendants' Conspiracy Was Successful

263. UPGA was correct; the potato cartel's efforts began to see significant progress in raising prices starting in 2005 (and continuing to the present) as the cartel was able to maintain and control reductions in the potato supply.

264. According to a *Spudman* reader survey in May of 2006 — cited in then-UPGA CEO Julia Cissel's 2006 PowerPoint presentation titled "Managing Supply and Influencing Acreage" — "85% of all respondents said they have seen an increase in their profits since UPGA was formed."

265. Fall potato production in major states fell from 400.6 million cwt. in 2004 to 372.6 million cwt. in 2005.

266. The average potato price was approximately 23% higher in 2005 relative to 2004. The USDA noted that this was due to the bid-buy program instituted by UPGI.

267. According to Jerry Wright, CEO of UPGI, average Idaho grower returns had increased from $2.65 per cwt. in 2004 to $6.50 per cwt. in the 2005-06 season.

268. Between September of 2005 and June of 2006, potato growers received an average of $6.67 for every 100 pounds of potatoes — a nearly $4 increase from the previous year. By 2007, farmers were averaging $7.75 for every 100 pounds of potatoes.

269. In the same letter, Wright indicated that grower returns had increased from $3.06 per cwt. to $7.89 per cwt. in 2007.

270.   As a result of these efforts, by the summer of 2008, according to the Idaho Potato Commission, a ten pound bag of potatoes cost consumers $15 — up $6 over 2007.

271.   A 2008 study by an Agricultural Economics Professor at the University of Idaho confirmed that UPGI's and UPGA's efforts had led to increased prices. The study found that the Idaho monthly fresh potato prices increased from $3.89 per cwt in the pre-coop period to $6.63 per cwt in the coop period, while the US monthly fresh potato prices increased from $7 per cwt. to $10.19 per cwt. The study found that approximately 60% of the price increases were due to reasons other than increased production costs and that the cooperatives' price-fixing efforts were "likely to be the most significant factor explaining the identified price increases."

272.   The study found that "[a]s indicated by the US monthly fresh potato prices, all potato growers received higher prices since 2005, after the acreage management programs started being implemented in several potato growing regions in the country." Furthermore, the authors concluded, "we believe that the [UPGI] and potato growers cooperatives with similar objectives were successful in accomplishing their goals and impacted the fresh potato price level and volatility during the period of 2005-2008, which ultimately benefited all potato growers."

273.   In an article in the December 15, 2008 issue of *Packer Online,* Paul Dolan, General Manager of Associated Potato Growers, Inc., noted that demand was down from 2007 because potato prices were 50% higher than the previous year, a situation he attributed in part to "market unity."

274.   By 2009, potato prices had remained constant or grown for four consecutive growing seasons - something that had never happened in the more than a century that USDA has been keeping such records.

275.    On its previous website FAQ, UPGA stated that there was "no doubt" that its numerous efforts to reduce supply had impacted and improved potato prices: "Q: How can you prove that UPGA's efforts to manage supply influenced last year's price? A. While many factors influence supply, there is no doubt that UPGA's acreage reduction, acre buy-down, flow-control, and information sharing programs impacted the market."

276.    UPGA's 2010 Annual Report discusses how its anticompetitive scheme had inflated the prices for fresh potatoes. "GRI [U.S. Grower Return Index] continued to decline from 2002-03 to 2004-05. Once [UPGA] formed it implemented supply management programs, and the effect can be seen in the drop in total U.S. Fresh Shipments (and a corresponding increase in the GRI.)"

277.    UPGA's annual report also discussed how its anticompetitive scheme affected prices for process potatoes: "[b]efore United [UPGA] was formed nearly all of the process contracts were tonnage-based. As a result, process growers overplanted to avoid penalties associated with not delivering enough potatoes to meet their contract. The Potato Marketing Association of North America and processors began to switch the contracts from tonnage-based to acreage-based contracts. Acreage-based contracts minimized the uncertainty for the process grower and frozen processor while also reducing excessive flow of potatoes from the process sector to the fresh sector. Graph #3 reveals the frozen processing usage volumes versus out of field contract prices in Washington. [UPGA] has a data sharing agreement with PMANA [the Potato Marketing Association of North America] to improve the profitability of process growers."

278.    Defendants directly provided evidence of the success of their supply reduction efforts to cartel members.  UPGI's website distributed Flow Control charts, showing the Grower

Return Index ("GRI") – essentially the profitability of potatoes – on a weekly basis and indicating when flow control measures were "on" or "off."  These charts showed prices and GRI rising when flow control measures were in effect, and dropping when no flow control was in effect.

279.    Defendants further managed pricing via charts distributed on a weekly basis showing the GRI for potatoes.  Those charts state "Growers must manage daily supply to not oversupply daily/weekly demand."  They also list an "Actual" price but also a "Recommended" price.   They show an estimated return per cwt at the current "advisory price" and a "recommended upcharge for 5-9 and size A consumers."  These charts demonstrate direct control and input into member pricing by the Defendants.

280.    Thus, Defendants' and their co-conspirators' acreage restrictions, acreage buy-downs, and flow control measures caused potato prices to be fixed, raised, maintained, and/or stabilized.

281.    Defendants' anticompetitive scheme has continued to the present. For example, a May 2010 UPGA newsletter describes how 400 fresh and process potato growers in the United States attended 16 United Potato Partners seminars this year at which they "consider[ed] the latest about cost of production specific to their area, ponder[ed] current demand data and review[ed] United's published acreage guidelines before beginning spring planting." The seminars were designed to facilitate "informal discussions." Mr. Shahan was quoted as saying, "[t]hese seminars are one of the most important methods we have for communicating United's published acreage planting guidelines to member and non-member growers in a face-to-face setting." At each of these seminars, a representative of co-conspirator Bayer CropScience was also present.

282.   Similarly, on its website, UPGI had a page devoted to its 2010 Planting Guidelines, which were issued in September of 2009. UPGI has the following to say about planting:

> Harvest is in full swing, and many are establishing plans for next year's potato crop. By now, all of you already know the top line on this year's crop. Across the state, it appears we are experiencing higher yields. If this continues, we could have as much as 5% more potatoes statewide than expected. The same thing is happening in Wisconsin and Colorado. They, too, are experiencing higher yields. Your markets are already telling you what to expect. The GRI on Norkotahs today is $4.66 and on Burbanks it is $5.52. Realistically, given the likely size of this year's crop, we could easily see a larger than normal carry over into next year.
>
> **With this potential in mind, United of Idaho's Supply Committee is in agreement with ALL of the United of America Directors in recommending the follow planting guidelines for next year. All growers are asked to plant 70-75% of their 2004 base in 2010 to BALANCE next year's crop with this year's anticipated large carry over.** This recommendation to cut 2530% off your 2004 base acres will be finalized in November when we have the final tally on this year's yields and production nationwide. This same 70-75% planting guideline is extended to all fry contract growers. (Emphasis added.)

283.   In its 2011 Annual Report, UPGA confirmed that USDA data revealed that decreased acreage, as well as lower yields, led to stronger grower returns. In a chart presented in the Report, UPGA reported that total shipments of fresh potatoes had fallen from 107,368,000 cwt. in 2004-05 to 95,357,000 cwt. in 2010-11. Correspondingly, the growers' average return had more than tripled, rising from $3.11 per cwt. in 2004-05 to $11.42 per cwt. in 2010-11.

284.   In March 2012, Jerry Wright of UPGA announced on January of 2012 that UPGA, in a departure from its prior practice, chose not to promote specific planting guidelines for its members for the 2012 potato crop. Wright predicted that this omission would cause potato supply to increase significantly in 2012 and would also cause potato prices to fall. Wright did not

say, however, that the UPGA and its members were discontinuing all future use of potato planting guidelines or other supply control efforts.

285.    All Defendants involved in potato growing, packing, and selling operations herein (including the Wada Grower Entities, Wada Packer Entity and Wada Marketing Entities; Potandon; Blaine Larsen Farms; Michael Cranney doing business as Cranney Farms; Cornelison Farms; Snake River Plains Potatoes; Driscoll Potatoes; Lance Funk doing business as Lance Funk Farms; Rigby Produce; Pleasant Valley Potato; KCW Farms, Inc.; Kim Wahlen d/b/a Kim Wahlen Farms; Raybould Brothers Farms; and R.D. Offutt), as well as the individuals who controlled these operations, were direct participants in the supply reduction scheme outlined herein and followed acreage reductions, participated in the bid-buy-down program, participated in and utilized information obtained from marketing calls and packing reports, participated in "flow control," and/or reduced the domestic supply of potatoes for the express purposes of fixing, raising, maintaining and/or stabilizing prices.

286.    While certain aspects of UPGA's schemes have been publicly discussed, all attendees to UPGA Board of Directors and Committee meeting attendees must have signed a "United Confidentiality Agreement" each year and promised not to disclose information shared at these meetings.

287.    Any violation of that agreement allows UPGA to exclude such person from future meetings or to sue such a person in a court of law to halt disclosure and for damages experienced by UPGA as a result of any such disclosure.

### DEFENDANTS ARE NOT ENTITLED TO THE LIMITED PROTECTIONS OF THE CAPPER-VOLSTEAD ACT

288.    The Capper-Volstead Act provides an exemption from antitrust law for certain associations and cooperatives comprised of agricultural producers that meet specific criteria. The

Act protects an association and its members from antitrust scrutiny, provided that: (1) the association is operated for the mutual benefit of its members; (2) no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or that the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum; and (3) the association does not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members. The antitrust immunity provided by Capper-Volstead is "limited" and does not exempt all cooperative conduct from review under the Sherman Act.

289.   The Capper-Volstead Act only protects "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers." This phrase does not extend to a processor of agricultural products or any person or entity not engaged in farming, planting, ranching, and growing. Capper-Volstead Act immunity will not protect an association or any of its members if even one member fails to qualify as a "person[] engaged in the production of agricultural products."

290.   In a 1985 publication titled "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that "if an association of producers. . . restricts members' agricultural output . . . [or] colludes with third parties to fix prices ... [or] conspires with third parties to fix prices … [or] combines with other firms to substantially lessen competition.. . " then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

291.   UPGI, UPGA and their co-conspirators have used the advice of their antitrust lawyer (Randon Wilson of the Jones Waldo law firm) as cover from the Capper-Volstead Act for

their admitted supply-restriction efforts and conspiracy to fix, raise, maintain and/or stabilize prices.

292.     For example, in an article in the UPGA newsletter entitled "The power of cooperative collaboration," Mr. Wilson wrote:

> A grower who markets his crops or products alone has very little bargaining power. He is at the mercy of the market, where a processor could turn away his crop or delay receiving it. A grower is especially vulnerable if there is a market surplus. Yet, an individual grower can do very little to bring supply in line with demand. On the other hand, when growers join together in cooperatives they can achieve market power even when there is a surplus.
>
> ….
>
> The potato industry is to be commended. It might have sought federal orders which would mandate participation by all growers under a mandatory program. Much to their credit they have pursued a voluntary program through cooperation under the Capper-Volstead Act. . . . I urge all to join in the current industry efforts to achieve supply/demand balance and to make potato farming profitable.

293.     In another interview, Mr. Wilson stated: "I have high hopes the farmers will deal with this problem as an industry, that they will work together to bring the supply of potatoes into line with the demand. That's the name of the game."

294.     As discussed below, however, none of the defendants herein is entitled to the limited protections found in the Capper-Volstead Act for their efforts to restrict potato supply and fix prices. As an initial matter, Capper-Volstead does not protect pre-planting acreage reductions — one of the central agreements at issue in this case.

295.     UPGA and its co-conspirators' efforts at reducing potato supply fall outside and are not protected by the Capper-Volstead Act. UPGA, UPGI and their co-conspirators have

engaged in all of the activities discussed above, as well as others, which have negated their ability to claim immunity from antitrust laws under the Capper-Volstead Act.

296.    UPGA, UPGI and their co-conspirators are not entitled to the limited protections found in the Capper-Volstead Act for at least the following reasons:

(a)    UPGA and its members (including UPGI and the other member cooperatives) are not legitimate cooperatives and they do not market, process or sell potatoes—they are instead trade groups designed to serve as forums for a nationwide (and continent-wide) agricultural supply-restriction agreement among competitors. Their efforts have improperly and unduly enhanced prices;

(b)    UPGA and its members are made up of vertically integrated producers that are also packers and shippers in violation of the Capper-Volstead Act;

(c)    UPGA and its members implement predatory conduct and impose coercive, punitive and retaliatory measures against members that do not comport with the supply reduction conspiracy;

(d)    UPGA, its members, and co-conspirators have conspired and colluded with third parties to reduce supply and fix prices;

(e)    UPGA, its members, and co-conspirators have conspired and colluded with non-member potato farmers to reduce supply and fix prices;

(f)    UPGA, its members, and co-conspirators have conspired and colluded with foreign entities, including the United Potato Growers of Canada and Potato Marketing Association of North America, in an attempt to reduce supply and fix prices for the North American continent;

(g)    UPGA, its members, and co-conspirators have conspired and colluded with non-member "partners" who are not engaged in agricultural production and who have funded potato supply control efforts; and

(h)    UPGI, its members, and co-conspirators have conspired and colluded with "United II"—a non-grower, vertically integrated potato purchaser, to assist with supply-restriction efforts.

**I.    UPGA and its members operate as a price-fixing trade group, not a legitimate cooperative.**

297.    UPGA and its individual cooperative members (collectively referred to herein as "UPGA") do not engage in any of the functions enumerated under the Capper-Volstead Act. UPGA does not grow, harvest, ship, sell, bargain or compete for the sale of potatoes or any agricultural products. UPGA merely serves as a potato trade group and a forum for a supply management scheme and a price-fixing agreement. These activities fall outside the legitimate objectives of an agricultural marketing co-op.

298.    UPGA member cooperatives are made up of direct competitors rather than small farmers banding together to cut out the corporate middlemen who would otherwise market their potatoes. These cooperative members do not associate to collectively process, handle, and market their products, and UPGA does not provide those services.

299.    UPGA does not wash, grade, package, store, transport, or distribute its members' potatoes. UPGA does not negotiate contracts of sale for its members. UPGA does not "market" its members' products. Rather, as set forth in its promotional materials, publications, website, and numerous public statements, UPGA was founded for the express purpose of implementing a scheme to manage and restrict the supply of potatoes.

300.    In an *Agweek* article entitled "Valley Potato Association Thinking National: RRV Fresh Potato Growers Votes to Initiate Membership Drive for [UPGA],", a quotation from Buzz Shahan crystallized UPGA's purpose:

> "The UPGA is a federated coop *[sic]*, meaning our members are not growers," says UPGA's [COO], Buzz Shahan. "Our members are co-ops, to which growers belong. We facilitate the interaction, nationally, between co-ops and provide the legal umbrella under which they can discuss issues like supply and demand."

301.    In another *Agweek* article, entitled "Spud Growers Eye National Group: Red River Valley-Area Growers to Meet on Joining [UPGA]," author Mikkel Pates highlighted UPGA's role: "[Duane] Maatz, President of the Northern Plains Potato Growers of East Grand

246189                                    61

Forks, Minnesota, says the United Potato Growers doesn't negotiate contracts, but it can have a big effect because it links the region's farmers' information with a group that represents more than half of the U.S. fresh potato produces *[sic]*. . . ."

302.   As discussed herein, UPGA's and UPGI's price fixing and supply reduction efforts have unduly enhanced potato prices.

II.   **UPGA and its member cooperatives include producers that are also packers and shippers in violation of the Capper-Volstead Act.**

303.   Mr. Wilson, UPGA's attorney, publicly discussed that shippers and packers could not be affiliated with any Capper-Volstead Act potato cooperatives.

304.   The Capper-Volstead Act does not protect fully integrated producers that also grow, pack, process, store, and ship potatoes.

305.   Many of the founders of UPGI and UPGA, as well as numerous other co-conspirators, are integrated operators (called grower-shippers) that grow, pack, process, store, and ship their own and other growers' potatoes.

306.   For example, the vertically integrated Wada defendant entities operate a 140,000 square foot packing facility in Pingree, Idaho.

307.   In addition to growing and shipping, Defendant Larsen Farms, one of the founders of UPGI, refers to itself as a "fully vertically integrated operation." Larsen Farms has an on-site processing facility that cooks, dehydrates, mashes and further processes its potatoes.

308.   Other Idaho grower-shippers involved in the conspiracy alleged herein (some of whom are named as Defendants) include, among others: Cummins Family Produce, Inc.; Driscoll Potatoes; Floyd Wilcox & Sons, Inc.; Howard Taylor & Sons, Inc.; Pleasant Valley Potato; Rigby Produce; and Snake River Plains Potatoes.

309.    In a letter to UPGI members, Jerry Wright, CEO and President of UPGI, touted the competitive advantages of UPGI having producer-members who also ran packing sheds:

310.    In Idaho, packing sheds owned by members will be offering a grower-friendly pre-season purchase contract to members as an additional incentive to reduce acres. The contract would start at a guaranteed $4.50 base for those who idle 5% of their base acres; half the up and no down to the grower. The contract would increase in increments to $5.00 base for those who reduce potato acres up to 10% of their '04 acres; half the up and no down to the grower. Only a portion of the participating member's crop will be eligible for the contract. The contract base price will be guaranteed by the warehouse with United of Idaho backing the offer. Potatoes must meet typical contract quality and size standards. UNITED will also include dry eliminator contract with strong pricing incentives for those who have reduced acres.

### III.   UPGA and its member cooperatives impose predatory, coercive, punitive and retaliatory measures against members that do not comport with the supply reduction conspiracy.

311.    Predatory conduct and coercive tactics are beyond the scope of any legitimate business activity that may be protected by the Capper-Volstead Act.

312.    As discussed herein, UPGA utilized predatory conduct and coercive conduct in ensuring compliance with the price-fixing scheme alleged herein. For example, UPGA used satellite imagery, fly-overs, GPS systems, and other methods to enforce its agreement to reduce potato supply.

313.    UPGA also instituted surprise audits and inspections of members' farms to monitor compliance with its scheme.

314.     UPGA forced members to sign documents allowing UPGA board members access to growers' confidential federal farm subsidy forms in order to ensure that members were following its scheme.

315.     Members who did not comply with UPGA's supply restrictions were subject to fines (of $100 per acre) and other punitive measures, such as removal from the cooperative.

316.     UPGA also coerced non-members to join the price-fixing scheme and referred to them as "free-riders" who were profiting from the conspiracy, but not reducing acreage.

### IV.     UPGA and its members have conspired and colluded with third parties to reduce supply and fix prices.

317.     Under the Capper-Volstead Act, members of a co-operative may not collude or conspire with third parties.

318.     Yet UPGI, the Idaho grower cooperative whose founders also started the UPGA, colluded with numerous third parties in seeking to control Idaho and national potato acreage. For example, as discussed *supra*, UPGI entered into MOUs with PGI, SIPCO, and SPGI to control potato supply in Idaho. These groups were not entitled to any Capper-Volstead protections.

319.     UPGI and UPGA conspired with non-exempt packers and warehouses in implementing flow control measures.

320.     As discussed in more detail *infra,* UPGA also colluded with non-member growers in seeking to control supplies.

321.     As discussed in more detail *infra,* UPGI also colluded with non-growers in forming a joint venture with a potato dehydration plant that was designed to help its efforts to reduce supply and fix prices.

322.     As discussed in more detail *infra,* UPGA also colluded with financial "partners" that helped fund UPGA's supply-restriction efforts.

V. **UPGA, its members, and co-conspirators have conspired and colluded with non-member potato farmers to reduce supply and fix prices.**

323.    UPGA and its regional co-operative members routinely coerced and conspired with non-members in seeking to reduce potato supply and explicitly recognized the importance of having non-members follow their planting reductions and other supply-restriction efforts.

324.    In an interview on UPGA's website UPGA's attorney, Randon Wilson stated, "cooperatives wishing to benefit from the limited antitrust protection afforded by the Capper-Volstead Act must make sure that they do not enter into agreements with non-members to fix prices or limit supplies. They cannot be predatory or unduly enhance prices." This advice was not followed.

325.    UPGA and UPGI specifically sought out and allowed non-members to participate in their acreage reduction programs.

326.    On the same page as Mr. Wilson's advice above, UPGA discussed its recommendations for 2010 based on the "assumption" that non-members would also join its efforts to reduce supplies: "[UPGA's] recommendation for 2010 of planting 75 percent of 2004 base acreage takes into account the significant carryover that will accompany the industry into the fall harvest of 2010. As a result of carryover, growers producing for the out of field market in 2010 will likely need to cut beyond [UPGA's] recommendations. **It should be noted that the [UPGA] recommendations are still based on the assumption of non-members following the same guidelines as [UPGA] members for their operations as well.** Please consult with your United chapter for the latest information before you plant in 2010."

327.    UPGA's January 2006 newsletter stated that the co-operative "invites all non-members to attend their meetings, ask questions, and be a part of the solution and not the problem. We need every area in North America, big or small, to participate. By working

together, sharing information, and making smart business decisions, we have the unprecedented opportunity to make this industry profitable." (Emphasis added.)

328.    Mr. Shahan noted that these efforts to collude with non-members had paid off in a *Spud Smart* article, titled "U.S. Production Stays Steady:"

> Shahan says potato growers have really taken to UPGA's efforts. "Growers have seen the wisdom of matching supply to demand so they're much more educated in a side of the industry they have not understood before," says Shahan. "Curiously, the nonmembers are even receptive to the program, because it brings science to what has been sorcery."

329.    Thus, non-members were not only invited to participate in the price fixing scheme discussed herein, but they did actively participate at UPGA's direction and request.

330.    Shermain D. Hardesty, an agricultural economist that does work for UPGA, also noted that UPGA's leaders colluded with nonmembers to achieve compliance with supply reduction efforts:

> Because it is a voluntary organization, UPGA is facing the free rider problem. Nonmember producers benefit from the higher and more stable prices achieved, without having to reduce their acreage and control their sales flows. UPGA's leadership is striving to impress upon nonmembers the need for compliance and the significant additional benefits that could be derived by all producers from such cooperation.

331.    Upon information and belief, in January of 2008, Defendant United Fresh Potato Growers of Colorado reported on the UPGA Board of Directors Meeting in its newsletter:

> Mike Cranney, Supply Management Committee Chairman, reminded the attendees that in 2008 United's direction is that all United members will reduce acreage by five percent off of 2007 plantings. Non members will be urged to do the same.

332.    Upon information and belief, in December of 2008, in a special edition of its newsletter, the UPGA made a direct appeal to its members to reach out and conspire with nonmembers to limit supply in "United to growers: limit '09 acreage for survival":

Following an in-depth review of 2008 planting, production and storage data contrasted with ongoing falling demand for fresh potatoes and with an eye on a rocky, world-wide economy, the United Potato Growers of America board of directors decided at a December board meeting to strongly urge all fresh potato growers to plant no more acreage in 2009 than they planted in 2008.

**Members asked to reach out to their neighbors**

All members and co-op leaders are asked to immediately make a strong effort to reach out to members and non-members in their growing region to impress upon them the urgent necessity to freeze or even reduce fresh acreage in 2009. Everyone, including non United members, is asked to join United in an effort to manage supplies by limiting acreage in 2009.

333.    UPGA's then-CEO Julia Cissel prepared a PowerPoint presentation dated December 7, 2006, which explicitly encouraged non-member participation several times. One slide read as follows:

Conclusion: Supply Management depends on YOU!

1)    Manage your acres
2)    Insist on reasonable returns
3)    Engage and collaborate
4)    Convince non-members to follow .. they win too!
5)    DO THE RIGHT THING!

334.    In another UPGA PowerPoint, entitled "Report for 2008 Plan for 2009," UPGA again encouraged engagement with non-members. One slide read:

United's Plans for 2009

- What is the market's fundamental and guiding principle?
- Supply and demand is a real economic principle, and one that potato growers can manage
- Become a missionary: befriend all growers and encourage them to heed marketplace dynamics

335.    UPGI's April 2009 newsletter clearly identified the group's willingness to incorporate non-member participation:

Inventory Management

If acreage management isn't enough, United will be prepared with the option of implementing an Inventory Management Program.
However, in order to implement such a program, the following guidelines must be met:

> 75% member and base acre agreement to initiate the action
> 75% member and base acre ratification to implement
> A set percentage non-member participation for members to ratify

## VI.   UPGA, its members, and coconspirators have conspired and colluded with foreign entities in an attempt to reduce supply and fix prices for the North  American continent

336.    The Capper-Volstead Act does not protect non-United States farmers or cooperatives, nor does the Act protect domestic cooperatives that conspire with non-protected entities, such as foreign producers, to reduce global agricultural supply.

337.    In implementing the output restriction scheme discussed herein, UPGA has conspired with a Canadian potato association and a North American growers association made up of many Canadian growers.

338.    UPGA and UGPC are admittedly jointly managing North American potato supply.

339.    The UPGA and UPGC have an interest in preventing lower-priced imports from each other's members. By jointly agreeing on supply restrictions, each can limit or minimize the deleterious effects of low-priced imports flooding their market.

340.    A substantial amount of Canadian potatoes are imported into the United States each year. For example, Agriculture and Agri-Food Canada reported the following:

> In 2006-07, 118,926 tonnes of seed potatoes valued at $39 million and 471,491 tonnes of table potatoes valued at $145 million were exported. That same period, 970,000 tonnes of frozen French fries were also exported, making Canada the second largest french fry exporter after the Netherlands. The United States is Canada's main market for potatoes and potato products; 74% (by value) of Canadian potato exports were destined for the United States in 2007.

341.    Just as the United States is a very important export market for Canadian potato producers, Canada is an extremely important export market for United States potato producers. The Office of the United States Trade Representative noted in November of 2007:

> Canada is the United States largest export market for agriculture, including potatoes. In 2006, the United States exported $92.8 million in potatoes to Canada, representing 68.73 percent of all U.S. potato exports. Since 2004, U.S. potato exports to Canada have increased by 38.13 percent.

342.    As noted above, prior to UPGC's formation in August of 2005, representatives of seven potato producing provinces in Canada comprising more than 96% of the potato acreage in Canada met with the board of directors of the UPGA in Toronto. The expressed purpose of this meeting was to "jointly consider 'cross border' programs and cooperation that will greatly improve profitability for all growers in both countries." At the Toronto meeting, Canadian growers agreed to form a steering committee with representation from each province to define more concretely methods for collaborating between provinces and establishing a formal link with the UPGA.

343.    UPGC was foot led in February 2006 with the assistance of UPGA. In its Fall 2007 newsletter, the UPGC discussed its formation and the "legal advice" it received regarding collaborating with a U.S. cooperative:

> To my recollection the initial rational[e] for establishing this Corporation was that the U.S. had just footled a National Co-Operative (United Potato Growers of America), the Anti-Trust laws in the U.S. are such that an organization of this nature could possibly face legal issues, but there is a remedy for properly constituted agricultural co-operatives in the U.S. in the form of the Capper-Volstead Act. Legal opinion advised us, that as Canadians we would need to join this U.S. cooperative in order to communicate/cooperate with our U.S. friends and associates in their new cooperative.
>
> Thus the need to have a National group that could join our U.S. counterparts.

344.    In April of 2006, *Spudman* magazine reported that Gary Sloik, co-chairman of UPGC's steering committee, stated that his group and the UPGA would work closely together, and that Mr. Sloik stated that "[o]ur market is their market, and their market is our market. It's all one big puzzle."

345.    The UPGA states on its website that it assisted in the formation of UPGC in 2006 and also states that "[d]iscussions are ongoing with growers in other countries." The UPGA further states that it "has a data sharing arrangement with the UPGC." UPGA, on its website's FAQ section regarding its United Potato Partners Program, states "United reaches 80 percent of U.S. and Canadian potato growers by providing them with market intelligence that can improve profitability." The UPGA organization chart depicted *supra* the presence of UPGC as part of UPGA's structure.

346.    Starting in 2008, the United Potato Partners Program included third-party corporate partners, including Bayer CropScience, AMVAC Chemical Corporation, and WinField Solutions. Lee Frankel, UPGA President and CEO, said the purpose of the corporate partnerships was to allow the partners to "realize the strategic benefits of teaming up with United as a means of reaching the potato grower directly." "Above all," Frankel said, "Bayer CropScience's involvement in United helps our organization innovate and obtain the most up-to-date and accurate supply and demand data possible which then allows growers to grow and market their crops more successfully."

347.    In February of 2007, UPGA and UPGC held a joint meeting in Las Vegas, along with the PMANA. Sixty growers were in attendance. According to a press release the groups issued, at this meeting the growers agreed to "collaborate" and work together to reduce supplies across North America. Specifically, the groups agreed to work together to eliminate speculative

potato planting and manage 2007 plantings. The groups also agreed to a uniform data gathering and analysis program.

348.    Wada, UPGA's chairman at the time, discussed this joint meeting, stating: "[w]e are continuing our efforts and working together for a sustainable payday for all potato growers. We have made significant progress over the last year, and agreed that the level of collaboration among our three grower cooperatives will be heightened in 2007."

349.    In its Winter 2007 newsletter, UPGC noted that one of the benefits of joining it was that "UPGC offers a unique opportunity to partner with two strong U.S. Potato organizations [sic] United Potato Growers of America and Potato Marketing Association of North America (the potato industry is global)." UPGC also noted that the "US is our largest trading partner, it is critically important to be connected." The newsletter also featured an "open letter" from Mr. Shahan to the members of the UPGC, that, among other things, stated that "[w]e can now put all of our varying situations together into a master plan . . .

350.    UPGC represents 96% of the Canadian potato acreage.

351.    In its PowerPoint presentation entitled "Report for 2008 Plan for 2009," UPGA also discussed its work with foreign entities:

- "Worked to further trade between U.S. and Mexico for fresh potatoes"
- "Worked to achieve more current reporting for Canadian fresh-potato imports"
- "Improved United of Canada structure and effectiveness"
- "There is now a United of Europe"
- "The UK will have a similar structure soon"

352.    In July of 2008, The *Journal Pioneer* reported on the collective impact that UPGA, UPGC, and PMANA were having on reducing potato supplies:

> Teamwork can bring impressive benefits, says Buzz Shahan, chief operating officer of the United Potato Growers of America. U.S. potato producers were able to slash planted

acreage for 2008 by eight percent, or about 81,000 acres, firming up prices in the process. Idaho, the largest potato producer in North America, led the way with a 14 percent cut. Meanwhile, the (Prince Edward) Island's cut [in Canada] was cut by 3,000 acres over 2007, to 93,000 acres.

"PET growers have certainly pioneered the effort, they have already developed their systems (for managing potato production) in a very sophisticated way, but everybody else across the country needs to collaborate with PEI," said Shahan, a keynote speaker at province-wide meeting for growers, held Wednesday (Aug. 6) night at the Loyalist Lakeview Resort.

…

Shahan says the U.S. potato industry is seeking three cents more a pound for its producers. That works out to $10 a hundredweight instead of $7 and that's an enormous boost for them.

…

PET. . . was a big player in the formation of the United Potato Growers of Canada in 2006, which restrained production and boosted prices.

Shahan said American producers have been able to share a massive database of information about everything from shipping and marketing to planting—in fact nearly everything involved in raising and selling potatoes. That has played a major role in increasing prices and demand.

**VII.    UPGA, its members, and co-conspirators have conspired and colluded with non-member "partners" who are not engaged in agricultural production and who funded potato supply control efforts.**

353.    UPGA has "partnered" with non-agricultural producing companies that explicitly conspire with UPGA and assist in its efforts to reduce potato supply so that the companies can have access to UPGA members to sell their products.

354.    UPGA's website discusses this "United Partners Program" as a "strategic alliance" by which partner companies help offset UPGA's costs in implementing its supply-restriction scheme:

Q: What is the United Potato Partners Program?

A: The United Potato Partners Program has three objectives: 1. Maximize the price the potato producer receives for his annual crop. 2. Minimize the cost of gathering the market data that allows the producer to maximize price. 3. Provide manufacturers of crop- input products a direct link to their grower-users.

The market intelligence supplied by United's database matches supply to demand such that grower returns remain positive and stable. Financially healthy growers can afford healthy budgets. There is a cost to acquiring, analyzing, and implementing the data relating to potato markets. Until now, these costs have been borne by United's growers. Corporations that supply potato growers with everything from potato handling equipment, to tractors, to field chemicals and fertilizers, irrigation equipment, and packing and packaging equipment can now, through a carefully structured program, offset the cost of the database nationally and regionally.

355.   UPGA's March 2009 newsletter further discussed this "partnership" program: "[a]mong other benefits, the partner program reduces the costs to member growers of developing and maintaining United databases that are critical to grower sustainability." The 2009 partners were: Bayer CropScience, AMVAC Chemical Corporation and WinField Solutions. Further specific activities of non-defendant co-conspirator Bayer CropScience in connection with the UGPA have been discussed above.

356.   Lee Frankel, UPGA's CEO, stated, "[w]e are pleased that our partners are realizing the strategic benefits of teaming up with United as a means of reaching the potato grower directly and have chosen to extend their partnership with us. We definitely value the contributions of ideas and financial support of these agricultural corporations as United Potato Partners and look forward to another successful year for the potato industry overall. Growers should remember to thank our partners for their support by supporting them through purchases and use of their products when appropriate."

357.     These partners were aware of and supported the supply reduction price-fixing conspiracy alleged herein. For example, UPGI's April 2009 newsletter noted that at "the recent United Potato Partners meeting in March, [UPGI] announced its planting guidelines and inventory management for 2009-10."

## VIII.   UPGI, its members, and co-conspirators have conspired and colluded with a vertically integrated potato purchaser, a non-grower, to assist with supply restriction efforts.

358.     In 2007, UPGI facilitated the formation of a joint venture (Defendant Idahoan Foods) to create the second largest potato dehydrator in the country, as well as a second co-op to supply potatoes to this venture. The stated purpose of this joint venture was to assist UPGI and its co-conspirators in their overall scheme to reduce potato supply.

359.     As part of this transaction, UPGI formed a joint venture with Idaho Fresh-Pak, Inc. to create the country's second largest potato dehydrator. The purchase included Idaho Fresh Pak's four Idaho plants and the "Idahoan" brand names. UPGI then formed United II, a second co-op based in Idaho Falls, Idaho.  All UPGI members were able to join the new co-op (and had to join to be able to sell potatoes to the venture).  United II and R.D. Offutt next formed a joint venture entitled North American Foods, LLC. United II contributed the dehydration plants acquired from Idaho Fresh-Pak. R.D. Offutt contributed its three dehydration plants located in North Dakota, Nevada, and Idaho. Under a formula-based pricing arrangement, United II growers supplied all of the potatoes for the Idaho and Nevada plants.

360.    The new venture combined the potato supply resources of UPGI, the processing assets of R.D. Offutt in several states and the Idahoan facilities within Idaho, to create a broad network of potato processing plants with convenient access to markets and to customers.

361.    United II potato growers have ownership of the new company, receive dividends, and have a guaranteed market for their dehydrator-grade potatoes, which changes based on whether growers seek to further reduce supply.

362.    United II members are contractually bound to abide by all UPGI acreage management, data collection and dues assessment procedures. Failure by United II members to abide by UPGI policies, including acreage management, is punishable by fine or penalty.

363.    United II requires that all members "commit[] to allow participating sheds to divert up to 3% of the growers #1's and #2's into premium washed process grade to alleviate size specific excess as needed to balance the fresh pipeline. Decisions to divert will be made by the U-H board of directors." These high-quality potatoes otherwise would be sold on the fresh potato market. The Board makes decisions based on whether it seeks to prop up fresh supply prices by reducing supply.

364.    Thus, the United II board of directors, in its discretion, may "siphon off" a percentage of each member's best quality fresh potatoes, as United II explains in a document entitled "How to Join United II."  This "siphoning" is not done at normal market conditions or rates. It is done to lower fresh potato supplies in order to increase prices for the fresh potato grower owners of the cooperative and Idahoan.

365.    In addition, each United II member is encouraged to "commit between 5% - 10% of his total production as low quality field run.... This is NOT field run contracted for dehy processing. This is field run production grown for fresh consumption."

366.   The partnership between United II and Offutt has therefore facilitated the removal of up to 13% of growers' fresh potatoes from the fresh potato market.

367.   United II and its directors controlled the quality of potatoes to be dehydrated by Idahoan Foods. Idahoan Foods has no economic interest in dehydrating high quality potatoes. Idahoan Foods is owned and controlled by potato growers whose greater economic interest is to ensure a higher price for their fresh potatoes by siphoning off excess supply into the dehydration market.

368.   United II requires its members to commit to deliver 100% of processor quality potatoes produced on members' fresh base acres registered with United II.  Failure to deliver 100% of such potatoes is punishable by significant financial penalty.

369.   UPGI also discussed the venture in its March 2007 newsletter and stated "United of Idaho [UPGI] feels that the current dehy strategy being implemented is critical to United's overall mission of supply management."

370.   In a March 30, 2007 press release touting the joint venture, UPGI stated:

> "Since forming two and half years ago, United has proven its ability to manage fresh potato supplies, meet and match demand, and improve grower returns," said Jerry Wright, United president and chief executive officer. "This new venture will not only lead to a more stable dehy industry but also serve as an important tool for growers to balance their fresh crop and fresh industry marketing pipelines, all with the objective of improving grower returns. As a result, potato growers, our communities, and the entire industry will benefit."

> Under the terms of the agreement, United has formed United II, a new grower cooperative that will be involved in the new company with Idahoan and Offutt. Idaho potato growers who are members of United or who join United, can opt to join United II. By investing in United II, potato growers will have ownership of the new company, will receive dividends, and have a guaranteed market for their dehy grade potatoes.

"This new venture is another in a series of strategic initiatives by United to improve potato grower returns," said Wright. "The fresh and dehy industries work hand-in-hand. By maintaining a fair dehy price, fresh grower returns also improve. This new dehy company also provides United with an outlet for surplus potatoes."

Wright said, "Through United, growers have access to market data and facts that are crucial to their marketing. Through United II, growers who invest will have the opportunity to earn dividends while having a reliable market for their dehy grade potatoes."

Members of United II will be the sole potato suppliers for the new company. **"Potato growers will now be integrated vertically into the overall industry system,"** said Wright. "Through United II, we will create efficiencies from the development of seed to production to marketing. We anticipate greater long-term stability and no more boom or bust cycles." (Emphasis added).

371.    Furthermore, the April 2007 UPGI newsletter included a guest letter from UPGA board member Louis Wysocki congratulating UPGI members and R.D. Offutt for "displaying great vision in this new venture." Wysocki praised the grower members for having "gained the ability to divert fresh market over-supply of specific packs[.]" Wysocki reminded growers that, "[w]hile profitability in this new venture is a must and is important, the ball growers need to keep their eye on is the profitability [that] this effort provides to the larger portion of the grower's crop, which is sold as fresh."

372.    In November of 2007 at a joint meeting of UPGI and PGI in Pocatello, UPGI announced the new "Idahoan Fresh Potato Plan" as part of this venture. Jerry Wright, UPGI's Chief Executive Officer, said, "[Idahoan Fresh Potato Plan] is part of a long-term strategy we've had from Day 1, and that's vertical integration of growers into every aspect of the industry." As a part of the plan, UPGI proposed that growers sell 100% of their potatoes to United Idahoan Fresh.

373.   Jerry Wright, UPGI's president, outlined the plan as follows:

1.   The first step happened when United II entered into partnership with R.D. Offutt Company and purchased Idahoan Foods. Growers now own the largest dehydrator in North America.

2.   Starting in December, United will meet with groups of growers in each district to review the program and ask for your commitment. To meet the demands of the lender, a majority of growers will need to sign their contract between January and March of next year. The program will start selling potatoes in September 2008.

3.   Along with grower meetings, United will schedule shed meetings with the goal of consolidating sheds. Sign up will start in April 2008. As part of the plan, sheds can join a "merged ownership" pool with full equity ownership in NewCo or join a "lease group" where the shed owners maintains ownership and leases the facilities to NewCo. The presentation will also cover a fair exit strategy for owners based on a common valuation format offering cash with terms. NewCo can acquire inefficient sheds and close them, making up the purchase cost through increased efficiencies at the remaining sheds.

4.   The final step involves creating a coordinated sales and marketing system for the Idahoan potatoes. Growers and shed owners will see, at minimum, a system overview during the group meetings at the beginning of the year. Growers who commit their potatoes will receive cash payment on a staggered schedule. For all quality potatoes (based on independent harvest, cellar, and shed inspections), growers will receive $2.00/cwt as a down payment in October. After a successful holding period, growers will receive an additional $2.00/cwt in December. Then, based on market returns, growers will receive up to $1.25 in February. Growers will receive the balance of their returns, based on the market for the year, in September. Minus administrative expenses, growers will receive 100% of the up, a change from the current grower/shed relationship.

5.   The final settlement will reflect each grower's individual pack out and crop quality.

6.   To join, a grower must be a United member in good standing and adhere to the 2008-09 Acreage Planting Guidelines (reduce 20% off of 2004 acres). This acreage based contract requires 100% commitment of the fresh crop, with Idahoan Fresh honoring prior process grade and shed commitments.

## EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT

374.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition among the Defendants in the sale of potatoes was restrained and suppressed;

(b)    Prices of potatoes manufactured and sold in the United States by the Defendants were fixed, raised, maintained and/or stabilized at supracompetitively higher, non-competitive levels; and

(c)    Direct purchasers of potatoes, including Plaintiff, were deprived of the benefits of free and open competition in the purchase of potatoes.

375.    Defendants' contract, combination and conspiracy described herein consists of a continuing agreement, understanding and concert of action among the Defendants, the substantial terms of which were to artificially fix, raise, maintain, and/or stabilize prices paid by Plaintiff for the direct purchase of potatoes in the United States, its territories and possessions.

376.    In formulating and effectuating the contract, combination or conspiracy, Defendants did those things that they unlawfully combined and conspired to do, including, among other things: agreeing to artificially fix, raise, maintain and/or stabilize prices for potatoes in the United States, and implementing and monitoring the conspiracy among cartel members.

377.    The activities described above have been engaged in by Defendants for the purpose of effectuating the unlawful agreement to fix, raise, maintain and/or stabilize the prices for potatoes sold in the United States.

378.    As a direct and proximate result of the contract, combination and conspiracy alleged herein, Plaintiff was, and continues to be, damaged in its business or property in that it paid supracompetitive prices for potatoes, higher than that which it would have paid in the absence of the contract, combination, and conspiracy.

## TOLLING AND/OR PRESERVATION OF THE STATUTES OF LIMITATIONS AND FRAUDULENT CONCEALMENT

379.    The statutes of limitation as to Defendants' continuing antitrust violations were tolled and/or the causes of action were preserved by the pendency of the class action complaints against Defendants for conspiring to fix prices of potatoes in violation of the Sherman Act and the Kansas Restraint of Trade Act.

380.    The statutes of limitations as to Defendants' continuing antitrust violations were also tolled and/or the causes of action were preserved by Defendants' fraudulent concealment as alleged below.

381.    During the Relevant Period, Plaintiff believed in good faith at the time that it was paying competitive prices for potatoes purchased from Defendants.  Plaintiff did not know Defendants had entered into the conspiracy.

382.    Defendants' conspiracy was self-concealing, which prevented Plaintiff from discovering its existence.   Notwithstanding the self-concealing nature of their conspiracy, Defendants wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiff by, without limitation, and upon information and belief, one or more of the following acts:

(a)    Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

(b)    Confining the anticompetitive, unlawful plan to a limited number of people and key officials at each Defendant company;

(c)    Avoiding either references in publicly-available documents regarding conduct which would constitute an antitrust violation or anticompetitive act; and

(d)      Conducting covert, secret conspiracy communications or meetings in the United States.

383.    Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon because of the self-concealing character of the conspiracy and/or because of Defendants' fraudulent concealment of the conspiracy.

## CAUSES OF ACTION

### COUNT I
**Conspiracy to Fix Prices in Violation of the Sherman Act**
**15 U.S.C. § 1**
**(Against All Defendants)**

384.    Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

385.    Beginning at least as early as 2004 and continuing to the present, Defendants engaged in a continuing agreement, understanding and conspiracy to manipulate the production of potatoes and the price of potatoes in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

386.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing and sale of potatoes,  the substantial terms and purpose of which were:

(a)      To fix, stabilize, maintain and/or raise prices of potatoes in the United States and elsewhere;

(b)      To allocate the volume of sales and/or market shares of potatoes in the United States and elsewhere; and/or

(c) To control or reduce the output of and/or capacity to produce potatoes in the United States and elsewhere.

387. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts:

(a) They agreed to exchange and did exchange current and future price information about potatoes sold in the United States and elsewhere;

(b) They agreed to coordinate and did coordinate price levels and price movements of potatoes sold in the United States and elsewhere;

(c) They agreed on prices and price levels of potatoes sold in the United States and elsewhere;

(d) They agreed to allocate and allocated market shares of potatoes in the United States and elsewhere; and/or

(e) They agreed to control or reduce, and did control or reduce, the output of and/or capacity to produce potatoes in the United States and elsewhere.

388. Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including without limitation, participating in conversations and meetings in the United States, Canada and/or elsewhere to discuss the prices of potatoes to be sold and/or the volume of potatoes to be produced in the United States and elsewhere; participating in conversations and attending meetings in the United States, Canada and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in the United States and elsewhere in accordance with the conspiracy; and/or exchanging information on the sale of potatoes in the United States and elsewhere.

389.     As a result of Defendants' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during times relevant to these allegations:

(a)     Price competition in the sale of potatoes among Defendants and their co-conspirators to Plaintiff and others has been restrained, suppressed and eliminated;

(b)     Prices for potatoes sold by Defendants and their co-conspirators have been raised, fixed, maintained and/or stabilized at artificially high and noncompetitive levels throughout the United States and elsewhere; and

(c)     Plaintiff has been deprived of the benefit of free and open competition.

390.     Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations in amounts not yet ascertained.  Plaintiff's injuries as a direct purchaser of potatoes are injuries of the type that the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

391.     Because Defendants controlled approximately 80% of the Relevant Market, their collective price increases provided sufficient cover, or a "price umbrella," for non-cartel companies who sold potato products without fear of losing sales or market share.

392.     Plaintiff is threatened by continuing loss and damage as a result of Defendants' unlawful conduct.  Plaintiff therefore is entitled to injunctive relief.

**COUNT II**
**Violation of the Kansas Restraint of Trade Act**
**K.S.A. 50-101 ET SEQ.**
**(Against All Defendants)**

393.     Plaintiff re-alleges every paragraph above as if fully set forth herein.

394.    For the purposes of Plaintiff's claim under the Kansas Restraint of Trade Act, K.S.A. 50-101 and 50-112, the term "potatoes" includes fresh and process potatoes, as well as potato products.

395.    From at least as early 2004 and continuing to the present, with precise dates to be ascertained in discovery and proved at trial, Defendants actively engaged in an unlawful arrangement, contract, agreement, trust, or combination designed to control and manipulate the price of potatoes sold to Plaintiff, in violation of the Kansas Restraint of Trade Act.

396.    Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Kansas Restraint of Trade Act.   Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

397.    Defendants' actions in violation of the Kansas Restraint of Trade Act include, but are not limited to: participating in a collusive agreement to artificially raise and maintain pricing on potatoes through the implementation of coordinated price increases and production limits.

398.    Defendants affirmatively concealed from Plaintiff and the general public the existence of their illegal understandings and agreements through misrepresentations and omissions regarding this conspiracy.

399.    As a direct and proximate result of Defendants' conduct, Plaintiff directly purchased potatoes at prices higher than it would have paid and on terms that are less favorable than would have been available in a competitive market.   The anticompetitive effect of Defendants' illegal arrangements, contracts, agreements, combination and conspiracy was to

distort and/or artificially inflate the prices that Plaintiff paid for potatoes.  Defendants' actions further restrained and controlled the full and free competition in the market for potatoes.

400.    Defendants' actions deprived Plaintiff of the right to make budgeting, accounting, resource allocations and other financial and business decisions in a full and free competitive market for potatoes.

401.    As a result of its purchases, Plaintiff thereby suffered loss, injury and damage in an amount greater than $75,000, according to proof at trial.

402.    Under K.S.A. 60-161(b), Plaintiff is entitled to recover in its capacity as a direct and indirect purchaser of potatoes.

403.    Under K.S.A. 50-115, Plaintiff seeks the full consideration it paid for any potatoes sold to it by Defendants whose pricing was a result of the unlawful acts of one or more Defendants.

404.    Under K.S.A. 50-108 and 50-161, Plaintiff further seeks to recover treble the damages it sustained as a result of Defendants' conduct, as well as attorneys' fees, costs, and any additional remedies provided by law.

405.    There exists a significant threat of injury to Plaintiff because Defendants' anticompetitive actions continue through today and/or are likely to reoccur.

406.    Under K.S.A. 50-161, Plaintiff therefore seeks to have Defendants enjoined from directly or indirectly continuing the conspiracy and/or the agreement to artificially manipulate and inflate the price of potatoes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests a judgment:

1.      Declaring that the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants, were in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.;

2.      Finding against Defendants, jointly and severally, in treble the amount of Plaintiff's damages;

3.      Awarding to Plaintiff its attorneys' fees, costs and interest as allowable by law; and

4.      Entering a permanent injunction prohibiting Defendants from future violations of the antitrust laws and from practices that facilitate those violations.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury of all issues triable by jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place of trial.

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

/s/      Patrick J. Stueve
Patrick J. Stueve — KS Bar # 13847
stueve@stuevesiegel.com
Matthew L. Dameron – KS Bar #21071
dameron@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:  816-714-7100
Facsimile:  816-714-7101

**COUNSEL FOR PLAINTIFF**
**ASSOCIATED WHOLESALE GROCERS, INC.**